701 A.2d 99

**Champe C. McCULLOCH et al.**

**v.**

**Parris N. GLENDENING et al.**

**No.11, Sept. Term, 1997.**

Court of Appeals of Maryland.

Oct. 10, 1997.

James L. Shea (A. Samuel Cook, Mitchell Y. Mirviss and David R. Warner, Venable, Baetjer and Howard, L.L.P., on brief), Baltimore, for Appellants.

Edwin Vieira, Jr., Manassas, VA (Amicus of Larry D. Kump in support of appellants).

Lawrence P. Fletcher–Hill, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Andrew H. Baida, Asst. Atty. Gen.; Jonathan R. Krasnoff and Jean H. Baker, Asst. Attys. Gen, all on brief), Baltimore, for Appellees.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, J. (retired), Specially Assigned.

BELL, Chief Judge.

The issue this case presents is whether the Constitution and laws of Maryland authorize the Governor, as the Chief Executive of the State of Maryland, to address by the subject executive order labor-management relations in the Executive Branch by means of a system of collective bargaining. We shall hold, under the circumstances here presented, that they do.

█ It is well settled that not all collective bargaining agreements to which the State or a governmental agency is a party require prior express legislative approval; it is only those that contain a binding arbitration clause or are otherwise binding upon and enforceable against the State. *See Anne Arundel Co. v. Fraternal Order of Anne Arundel Detention Officers,* 313 Md. 98, 113–14, 543 A.2d 841, 848–49 (1988); *Office and Prof. Empl. Int'l Union Local 2 v. Mass Transit Admin.* ("MTA"), 295 Md. 88, 97, 453 A.2d 1191, 1195 (1982); *Maryland Classified Empl. Ass'n v. Anderson* ("MCEA"), 281 Md. 496, 508–513, 380 A.2d 1032, 1038–41 (1977); *Mugford v. City of Baltimore,* 185 Md. 266, 270–71, 44 A.2d 745, 747 (1945). In *MTA,* the principle was stated thusly:

absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees.

295 Md. at 97, 453 A.2d at 1195. We stated the purpose of the rule in *Montgomery County Educ. Ass'n v. Board of Educ. of Montgomery County*, 311 Md. 303, 313, 534 A.2d 980, 984–85 (1987), is "to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion." We must keep this principle before us as we consider the issue presented.

The genesis of this case is Executive Order 01.01.1996.13, which Governor Glendening issued on May 24, 1996.[1] Entitled "Procedures for Labor–Management Relations in the Executive Branch of State Government," the stated goal of the Executive Order is to ensure "constructive and cooperative relationships between the Executive Branch and Executive Branch employees" to the benefit of the citizens of this State. To that end, it gives to the employees[2] of the principal departments within the Executive Branch,[3] the Maryland In-

---

**1.** Before he issued the Executive Order, the Governor sought the advice of the Attorney General, which he received in a letter dated May 23, 1996. In that letter, Attorney General Curran opined that the Executive Order "does not involve the kind of collective bargaining that requires statutory authorization," *i.e.*, it is not "binding collective bargaining— that is, a process of negotiation between State officials and employee representatives that culminates in an agreement enforceable against the State." He also made the point that "no specific statutory authorization is needed for State officials to meet with employee representatives to discuss aspects of labor relations."

**2.** "Employee" does not include student, temporary, confidential, managerial, and supervisory personnel, individuals in custody of the Department of Public Safety and Correctional Services, and chief administrative or executive officers of an agency. ¶ E(2).

**3.** The principle departments of the Executive Branch of the State government are enumerated in Maryland Code (1996, 1995 Repl. Vol, 1997 Supp.) § 8–201(b) of the State Government Article: (1) Agriculture; (2) Budget and Management; (3) Business and Economic Development; (4) the Environment; (5) General Services; (6) Health and Mental Hygiene; (7) Housing and Community Development; (8) Human Resources; (9) Juvenile Justice; (10) Labor, Licensing, and Regulation; (11) Natural Resources; (12) Public Safety and Correctional Services; (13) State Police; and (14) Transportation. By its express terms, the Executive Order does not apply to "employees of the Mass Transit Administration, as that term is defined in § 7–601(a)(2) of the Transportation Article."

surance Administration, the State Department of Assessments and Taxation, and the State Lottery Agency, ¶ A, the "right to: (1)[o]rganize, form, join or assist any employee organization; (2)[b]argain collectively[4] through representatives of their own choosing; (3)[e]ngage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection insofar as any such activity is not prohibited by any other law of the State of Maryland or this Executive Order." ¶ C. As paragraph E(1), defining "collective bargaining," "bargain collectively," and "negotiate," makes clear, the objective of giving the employees the rights set out in paragraph C is so that "[t]he parties, upon completion of negotiations, shall execute a written memorandum of understanding incorporating the terms of any agreement reached." That paragraph also provides some conditions:

> to the extent [any terms of the agreement] require legislative approval or the appropriation of funds, [those] terms shall be recommended to the Legislature for approval or the appropriation of funds, as may be necessary. The duty to bargain shall include the obligation to negotiate in good faith for the purpose of resolving any questions arising under an existing memorandum of understanding. Notwithstanding the foregoing, the employer shall not be required to negotiate with regard to any matter that would be inconsistent with applicable law, and the employer may negotiate and reach agreement with regard to any such matter only if it is understood that the agreement with respect to such matter cannot become effective unless the applicable law is amended to eliminate any such inconsistency.

The Mediation Unit of the Department of Labor, Licensing and Regulation is designated by the Governor to administer the Order and, for that purpose, given certain rights. Those

---

**4.** Paragraph E(1) defines "collective bargaining," "bargain collectively," and "negotiate" as "the mutual obligation of the employer and the employee exclusive bargaining organization to negotiate in good faith at reasonable times and places with respect to wages, hours, and other terms and conditions of employment."

rights include the power to hold hearings, conduct elections, make determinations regarding the certification of the "exclusive bargaining representative," promulgate guidelines, and establish procedures for the implementation of the Order. ¶ D. The Mediation Unit's powers do not include the initial determination of the bargaining units and the assignment of the employees to them; that responsibility has been given to the Secretary of Personnel[5] or the Governor's designee. ¶ F. The Order also enumerates the factors to be used in making the unit assignments, *id.*, and it defines the "appropriate bargaining units" in terms of nine categories of employees, ¶ E(10).

The Executive Order contains detailed procedures concerning the certification of "employee organizations"[6] as "employee exclusive bargaining representatives."[7] The authority of the administrator of the Order to certify an exclusive bargaining unit and to resolve disputes with respect to the conduct of representative elections is treated in paragraph G. That paragraph also provides for employee organization agreement and, in fact, prescribes a procedure for resolving any disputes with respect to them:

> [I]n any election involving more than one employee organization. Such organizations can agree, subject to the approval of such official, that disputes regarding specified issues will be resolved by an impartial third party arbitrator

---

5. Effective July 1,1996, the Department of Personnel was moved to the Department of Budget and Management as the Office of Human Resources. The former Secretary is now the Executive Director of Human Resources. *See* Laws, 1996, ch. 349 § 3.

6. Paragraph E(8) defines "employee organization" as " an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, hours, and terms and conditions of employment of such employees."

7. "Employee exclusive bargaining representative" and "exclusive bargaining representative" is defined as "an organization certified as the exclusive bargaining representative pursuant to the provisions of this Order." ¶ E(9).

selected in accordance with such agreement, and the decision or decisions of such arbitrator shall be final and binding on such organizations; and provided further, that any such agreement shall provide that the costs of the arbitrator shall be shared equally by the employee organizations involved.

The procedure for an employee organization to petition for certification as the bargaining representative for a particular bargaining unit, when and by whom notice of the petition is given, and the procedure for intervention are addressed in paragraphs H, I, and J. Elections under the Order are the subject of paragraph K, while paragraph L deals with the duration of a certification as the employee exclusive bargaining representative and paragraph M involves decertification petitions. Although an exclusive bargaining representative enjoys certain rights under the Executive Order,[8] *i.e.,*

(1) [e]ntitled to speak on behalf of all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership;

(2) [e]xclusively permitted to have organizational membership dues collected by payroll deduction upon signed written request of employee conforming to law; except that any other organization that qualifies for payroll deduction of dues pursuant to § 6–402 of the State Personnel Article of the Annotated Code of Maryland shall continue to be eligible to receive payroll deduction of dues for as long as it remains so qualified; and

(3) [e]ntitled to meet and negotiate with the Governor or the Governor's designee on wages, hours, and working conditions in an effort to reach an agreement subject to the approval of the Governor,

¶ O, minority rights were not ignored. In addition to the proviso in paragraph O(2), paragraph N of the Order provides:

---

8. On the debit side of the equation for the employee organization certified as the exclusive representative, the Order prohibits a strike or work stoppage. ¶ Q.

Certification of an employee exclusive bargaining representative shall not preclude any employee or group of employees, regardless of employee organization membership, from bringing matters of personal concern to the attention of appropriate officials with a representative of his/her own choosing in a grievance proceeding held pursuant to a memorandum of understanding.

Moreover, certain actions are proscribed by managerial and supervisory employees, "to the fullest extent permitted by law:"

(1) [i]nterfering with, restraining, or coercing Executive Branch employees in the exercise of rights granted by th[e] Order;

(2) [i]nterfering with, restraining, or coercing an Executive Branch employee with respect to selecting a representative for purposes of negotiating collectively or adjustment of grievances;

(3) [r]efusing to bargain collectively with the employee exclusive bargaining representative as required in th[e] Order; or

(4) [r]efusing to negotiate in good faith or to execute or implement any memorandum of understanding negotiated pursuant to th[e] Order.

¶ P.

Paragraph R addresses the revocation or amendment of the Order, simply stating that "[t]his Order may be revoked or amended by the Governor at any time." Finally, the Order makes clear that "[t]he provisions of this Order shall in no way diminish or infringe any rights, responsibilities, power or duties conferred by the Constitution of the State of Maryland and the Annotated Code of Maryland." ¶ S.

Champe C. McCulloch, Donald P. Hutchinson, and John R. Tydings, the appellants,[9] as resident taxpayers of Maryland,

---

9. Champe C. McCulloch is President of Maryland Chamber of Commerce; Donald P. Hutchinson is President of the Greater Baltimore

filed a Complaint and Request for Declaratory and Injunctive Relief in the Circuit Court for Anne Arundel County, seeking to prevent the implementation of Executive Order No 01.01.1996.13. Naming as defendants Governor Parris N. Glendening and Eugene A. Contie, Jr, Secretary of the Maryland Department of Labor, Licensing and Regulation ("the appellees"), the appellants alleged that the Order is invalid and unconstitutional because (1) it violates the separation of powers doctrine and exceeds the statutory powers of the Governor; and (2) it conflicts with the Maryland General Assembly's repeated rejection of similar collective bargaining bills and the Assembly's enactment of the State Personnel Management System Reform Act of 1996, Md.Code (1996, 1997 Repl.Vol.) §§ 3–101 to 3–107 of the State Pers. & Pens. Article. Cross motions for summary judgment having been filed, the circuit court, after conducting a hearing on the motions, issued a Memorandum and Order declaring the rights of the parties and upholding the validity of the Executive Order. Following the appellants' timely appeal to the Court of Special Appeals, on our own motion and before that court considered the matter, we issued the writ of certiorari to address the important issues raised. We shall affirm the judgment of the circuit court.

## I.

The circuit court found that "Executive Order 01.01.1996.13 meets Maryland constitutional and statutory requirements and is not in violation of the separation of powers." The court also rejected the appellants' argument that the Legislature's failure to pass comprehensive collective bargaining legislation either preempted the Order or somehow precluded its issuance. Moreover, finding that the Order is a valid exercise of the Governor's broad authority to supervise and direct Executive Branch employees, the court concluded as well that the

---

Committee; and John R. Tydings is President of the Greater Washington Board of Trade.

Order did not impose any limits on the Governor's or the General Assembly's ability to carry out their functions.

On this appeal, the appellants maintain the same themes they asserted in the trial court. They present in this Court four arguments which they maintain require reversal of the judgment below:

> **First,** the Executive Order collides impermissibly with both the Personnel Reform Act of 1996, in which the General Assembly expressly adopted a contrary approach to employee relations, and also with the direct legislative defeats of similar statewide initiatives over more than 50 years. **Second,** the Order exceeds the Governor's limited power to issue executive orders and otherwise establish State personnel policy. **Third** and **Fourth,** the Order violates Maryland's constitutional separation of powers doctrine because it imposes both an "exclusive" and "binding" system of collective bargaining upon the State and its employees without prior legislative authorization.

Not surprisingly, the appellees take the contrary view. Finding no flaw in the decision of the circuit court, or the reasoning underlying it, they urge this Court to affirm that judgment.

## II.

### (a)

■ Appellants argue, quoting *Crane v. Meginnis,* 1 G. & J. 463, 477 (1829), that the separation of powers doctrine creates a sharp demarcation in the lines of authority of government, and it "confine[s] in practice the action of each department to its own appropriate sphere, by forbidding to it the use of powers allotted to the co-ordinate departments." Hence, they insist that, by issuing the Executive Order "absent express legislative authority" and in spite of numerous legislative defeats of similar initiatives, the Governor effectively usurped the law-making power of the Legislature.

The Governor's executive power is expressly provided in the Maryland Constitution. It can be found in two sections, namely, Article II, § 1, which vests the executive power of the

State in the Governor, and Article II, § 9, which directs the Governor to take care that the laws are faithfully executed. As the Chief Executive of State government, the Governor is responsible for the execution of the laws of Maryland. Md. Const. Art. II, § 1; *Bradshaw v. Lankford*, 73 Md. 428, 21 A. 66 (1891).

■■ The separation of powers doctrine is found in Article 8 of the Declaration of Rights of the Constitution of Maryland. It provides:

[T]he Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one said Departments shall assume or discharge the duties of any other.

Despite its language, the doctrine has never been so rigidly applied, certainly not to the point of creating the sharp demarcation that the appellants envision. To the contrary, this Court has quite recently stated that it has "repeatedly pointed out that Art. 8 of the Maryland Declaration of Rights does not impose 'a complete separation between the branches of government.'" *Judy v. Schaefer*, 331 Md. 239, 261, 627 A.2d 1039, 1050 (1993)(quoting *Dep't of Trans. v. Armacost*, 311 Md. 64, 81, 532 A.2d 1056, 1064 (1987)). Indeed, rooted in the belief that "separating the functions of government and assigning the execution of those functions to different branches was fundamental to good government and the preservation of civil liberties," *Armacost*, 311 Md. at 78, 532 A.2d at 1062, its purpose, therefore, is to "preserve[ ] to the one branch of government its *essential* functions and prohibit[ ] any other branch from interfering with or usurping those functions," *O'Hara v. Kovens*, 92 Md.App. 9, 22–23, 606 A.2d 286, 292, *cert. denied*, 328 Md. 93, 612 A.2d 1316 (1992), not, as argued by appellants, to create clear lines of "demarcation." Since the beginning of our constitutional democracy, this Court has recognized that the respective powers of the legislative, executive and judicial branches of government are not "wholly

separate and unmixed." *Crane,* 1 G. & J. at 476 [10]; *see also Christ v. Dep't of Nat. Resources,* 335 Md. 427, 441, 644 A.2d 34, 40 (1994); *Baltimore v. State,* 15 Md. 376, 459(1860) ("The words of the Article appear to be plain enough, but they have not been accepted in their literal sense."); *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 220, 334 A.2d 514, 521 (1975)("the separation of powers concept may constitutionally encompass a sensible degree of elasticity"); 1 F. Cooper, *State Administrative Law,* at 15 (1965)("the doctrine of separation of powers does not forbid the exercise by one department of powers that could appropriately be exercised by another department ... there may be a 'blending' of disparate powers"). Thus, the separation of powers doctrine does not require absolute separation between the branches of government. *See generally Baltimore,* 15 Md. at 459 ("entire practical separation was not designed").

Contrary to the suggestion by the appellants that the subject of the Executive Order is one resting solely and exclusively within the purview of the legislative branch, and without in any way denigrating the legislative prerogative in this area, the Executive has a significant role in setting policies to govern the management and supervision of State employees; the Governor has broad discretionary powers granted him both by the Constitution, as we have seen, and by statute. Entirely consistent with, and complementary of the Governor's executive power under Article II, § 1, the General Assembly has, through enactment of Md.Code (1957, 1995 Repl.Vol.) § 3–302 of the State Govt. Article, entrusted to the Governor the power to establish personnel policies and to

---

**10.** The appellants' reliance on *Crane,* 1 G. & J. at 476 for the proposition that "the legislative department is nearest to the source of power and is manifestly the predominant branch of the government" is misplaced in two material respects. First, *Crane* involved "the exercise by the Legislature of judicial power in the passage of law," *id.* at 477, not the exercise by the Executive of legislative power or vice versa. Second, at the time *Crane* was decided, the Maryland Constitution of 1776 expressly provided for the appointment of the Executive by the Legislature. Despite these two differences, we recognized in *Crane* that the powers of the branches of State government are "blended" and "mingled together." *Id.* at 476.

require executive agency heads to carry out those policies. Reminiscent of Article II, § 1, § 3–302 declares, "[t]he Governor is the head of the Executive Branch of State government and, except as otherwise provided by law, shall supervise and direct the officers and units in that Branch." *See* Md.Code (1996, 1997 Repl.Vol.) § 2–201 of the State Pers. & Pens. Article ("an employee in the Judicial, Legislature, or Executive Branch of State government is governed by the laws and personnel procedures applicable in that Branch"). In addition, the Legislature has authorized the Governor to issue executive orders that

(1) proclaims or ends a state emergency, under Article 41, § 2–101 of the Code;

(2) adopts guidelines, rules of conduct, or rules of procedure for:

(i) State employees;

(ii) units of the State government; or

(iii) persons who are under the jurisdiction of those employees or units or who deal with them;

(3) establishes a unit, including an advisory unit, study unit, or task force; or

(4) changes the organization of the Executive Branch of the State government.[11]

---

**11.** The Governor has broad authority to reorganize and reassign functions among executive branch agencies pursuant to Article II, section 24, of the State Constitution, which provides in pertinent part:

The Governor may make changes in the organization of the Executive Branch of the State Government, including the establishment or abolition of departments, offices, agencies, and instrumentalities, and the reallocation or reassignment of function, powers, and duties among the departments, offices, agencies, and instrumentalities of the Executive Branch. Where these changes are inconsistent with existing law, or create new governmental programs they shall be set forth in executive orders in statutory form which shall be submitted to the General Assembly within the first ten days of a regular session. Section 8–301 of the State Government Article states that "[i]n addition to any reorganization under Article II, § 24 of the Maryland Constitution, the Governor may order any other reorganization of the Executive

Md. Code (1957, 1995 Repl.Vol.) § 3–401, State Govt. Article. Given the breadth of the authority that the Legislature has bestowed on the Governor in § 3–302 and § 3–401(2), (3) and (4), a strong argument can be made, as the appellees have done, that the Executive Order can be upheld on the statutes alone. In any event, when the statutory and constitutional provisions are considered together, it becomes crystalline that the Governor has broad power and authority over Executive Branch employees and their working conditions.

We made just that point in *Maryland Classified Empl. Ass'n v. Schaefer,* 325 Md. 19, 34, 599 A.2d 91, 98 (1991), *cert. denied,* 502 U.S. 1090, 112 S.Ct. 1160, 117 L.Ed.2d 407 (1992). At issue in that case was the validity of an Executive Order that increased the work week of most State employees from 35½ to 40 hours without additional compensation. The Governor's reasoned that a "standardized '40 hour work week for State government [would] achieve cost containment through increased productivity and employee development.'" *Id.* at 22, 599 A.2d at 92. To achieve that end, the Governor directed the Secretary of Personnel and designated authorities to "take all actions necessary or desirable to implement" the Executive Order. *Id.* at 21, 599 A.2d at 92. The plaintiffs contended, *inter alia,* that the Governor's promulgation of the Executive Order usurped the plenary power of the General Assembly and exercised a legislative function, which violated the separation of powers doctrine. *Id.* at 28, 599 A.2d at 95. This Court rejected that argument, essentially the same one made here, observing:

> [T]he Governor, as head of the Executive Branch, has broad powers with respect to Executive Branch State employees and over the Secretary of Personnel, who exercises his power subject to the Governor and carries out the Governor's policies with respect to personnel matters. Consequently, there is no foundation to the plaintiffs' argument

Branch that is considered by the Governor to be necessary and desirable and that is not inconsistent with law."

that the Governor has no authority to fix normal work week by Executive Order.

*Id.* Moreover, we adopted the trial court conclusion, "that the definition of an Executive Order in § 3–401 of the State Government Article was sufficiently broad 'to allow the Governor to control and direct the officers over whom he is statutorily given control ... [including] the essential aspects of state employment such as hours in a work week.'" *Id.* at 29, 599 A.2d at 95.

In this case, as we did in *Schaefer,* we agree with the trial court that "Executive Order .01.01.1996.13 meets Maryland constitutional and statutory requirements and is not in violation of the separation of powers." The Governor's broad authority, under Article 8 of the Maryland Declaration of Rights as well as sections 3–302 and 3–401 of the State Government Article, to issue executive orders for the guidance and direction of units and employees of the Executive Branch necessarily permits the promulgation of an executive order authorizing the limited collective-bargaining rights for Executive Branch employees contained in the subject Order. This act is an exercise of executive function, not a usurpation of legislative function.

(b)

Appellants' second contention is that the Executive Order is invalid because it conflicts with the labor-management scheme adopted by the General Assembly in the enactment of the State Personnel Management Reform Act of 1996, §§ 3–101 to 3–107 of the State Pers. & Pens. Article. Appellants argue that, while the Act "avoids both the collective-bargaining and the non-binding 'labor-management partnership' of meet and confer sessions with labor organizations," the Executive Order mandates a process "requiring collective bargaining between management and union toward the execution of formal agreements on conditions of employment." Hence, according to the appellants, the Executive Order "contradicts the Act's objective of informal, participative employee-management relations by establishing a competing and over-

lapping scheme for resolving workplace conditions." Specifically, appellants contend:

> The conflict between these two competing systems of employee-management relations is severe. One is administered generally by the Secretary of Personnel, the other by the Secretary of Labor. Apart from overlapping jurisdiction—which poses the obvious risk of inconsistent or even contradictory policies emanating from the respective systems and their administrators—the whole tenor of employee relations will be dichotomized into two diverse pathways, one voluntary and participative, the other mandatory and adversarial.

The State Personnel Management Reform Act provides for the "empowerment" of employees in each principal unit of government within the State Personnel Management System, through the establishment of employee/management teams,[12] § 3–102(a), which shall meet at least once monthly, § 3–106(a), publish minutes of the meetings, § 3–106(b), and report quarterly to the head of the relevant unit, § 3–106(c). Although the Secretary may waive the requirement for any principal department, § 3–103, each head of a principal unit is required to submit a plan by January 1 of each year identifying the number, and objectives, of employee/management teams established, § 3–102(b)(1), which the Secretary must evaluate "with regard to servicing the interests of the public and in fostering a system of participative management, § 3–102(b)(2)." The Act also mandates that each team establish goals and objectives reflective of the "overall mission of the principal unit," § 3–105(a), which must, however, include certain core objectives:

(1) to encourage new ideas;

---

12. Section 3–101(b) provides:

> (b) *Employee/management team.* "Employee/management team" means a group established by the head of a principal unit, that is comprised of members of management and employees for the purpose of working together through open and candid discussions on issues of mutual interest.

(2) to seek the highest level of quality, productivity, and service;

(3) to develop open communications between management and employees; and

(4) to identify problems and propose resolutions.

Finally, there is prescribed a code of conduct for these management teams:

Members of the employee/management teams shall conduct themselves in a manner that fosters:

(1) a climate of openness and good faith;

(2) an atmosphere of mutual respect and trust:

(3) an environment safe from any fear of retaliation; and

(4) a spirit of stewardship for the well-being of the public served. § 3–104.

[5] Our comprehensive review of the Act and comparison of it with the Executive Order, fails to reveal, and the appellants have failed to point to, any inconsistency, other than the difference between the employee/management teams and the exclusive representative for the bargaining unit, which would or could have the effect of preventing the two systems from coexisting. Certainly the goals and objectives of the teams are consistent with the purpose for which the Executive Order was promulgated; both the Act and the Executive Order envision a labor-management process with the goal of resolving employment-related disputes through open, candid, and good faith discussion between management and employees. Indeed, as the appellants concede, "the Order's scope and objectives are the same as those of the Personnel Reform Act. Both address the resolution of work rules, working conditions and employee benefits." And, they have not shown that the Legislature intended that the employee/management teams be the exclusive means of employee/management relations.[13]

---

13. The appellants rely on the legislative history of the State Personnel Management Reform Act to support their argument that the Executive Order contravenes that Act. They note that, "in the very session in which it enacted [the Act], the General Assembly rejected the Gover-

Although the employee/management teams of the Act and the bargaining units of the Executive Order overlap and may be duplicative, we conclude that the two mechanisms could co-exist. First, the Secretary may waive the establishment of employee/management teams. Second, the employee/management teams and the bargaining units could operate separately, whereby employees, who believe that their views are not adequately represented by the exclusive bargaining representative designated pursuant to the Executive Order, may address the same or different employment-related matters in the employee/management team meeting. Third, the two mechanisms could operate harmoniously. Since the employee/management teams are required to meet at least once each month and publish the minutes of all meetings, the bargaining units could take advantage of the ideas and discussion of the employee/management teams. Also, the "non-binding" nature

nor's bills to adopt a collective bargaining scheme comparable to the one he imposed in the Order" and that "[b]oth the Senate Finance Committee and the full Senate also rejected gubernatorial and union-led efforts to graft collective bargaining into the very location in the personnel reform bill where the employee participation teams were eventually enacted." Moreover, the appellants point to "countless" ill-fated and unsuccessful attempts to enact collective bargaining legislation over the past 50 years as further evidence of the Legislature's clear opposition and intention to exclude it. We are not persuaded.

First, the appellees astutely observe "[i]f the Legislature's failure to act were determinative, as appellants contend, then this Court could infer from the General Assembly's failure to reverse legislatively the circuit court's January 29, 1997 decision that the Legislature agrees that the Executive Order is a lawful exercise of the Governor's authority." Furthermore and in any event, it is well settled that ' "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent.' " *T.H.E. Insurance Co. v. P.T.P. Inc.*, 331 Md. 406, 422, 628 A.2d 223, 230–31 (1993)(quoting *Automobile Trade Ass'n v. Insurance Comm'r*, 292 Md. 15, 24, 437 A.2d 199, 203(1981)). To like effect, *see, Local 598, Council 58 Am. Fed'n v. City of Huntington*, 317 S.E.2d 167, 168, 173 W.Va. 403 (W.Va.1984), in which the Supreme Court of West Virginia rejected the contention that "the legislature's continued unwillingness to adopt a proposal allowing collective bargaining agreements specifically indicates that the legislature did not intend to allow such a practice to develop." As the appellees accurately point out, this is especially so where, as here, the effect of such an interpretation is to deprive the Governor of his constitutional and statutory authority.

of the periodic reports submitted to the head of the principal unit and the memorandum of understanding, *see infra,* would permit the Governor or the Governor's designated representative to consider ideas for recommendation to the Legislature.[14]

### (c)

 The appellants argue that the Executive Order is illegal because it establishes a system structured to culminate in "binding" collective bargaining agreements establishing wages, hours, pension rights, or working conditions, and, as such, "absent express legislative authority," should not have been issued. They posit that the Order contains ten characteristics consistent with those found in admittedly binding collective bargaining agreements, namely, (1) exclusive union representation; (2) mandatory good faith negotiations over wages, hours and working conditions, and mandatory reduction of any negotiated agreement to writing; (3) limited rights of employee grievants; (4) authorization of payroll deductions of union dues; (5) prohibition of strikes and other work stoppages; (6) an impasse resolution procedure; (7) the public employer's final authority over execution of a collective bargaining agreement; (8) legislative oversight of fiscal terms; (9) the executed agreement as a "binding" bar against rival union representation elections during the negotiated agreement term; and (10) the public employer's power to rescind the entire collective bargaining system at will.

---

**14.** Relying on two federal cases that are based on the National Labor Relations Act ("NLRA"), *National Labor Relations Board v. Cabot Carbon Co.,* 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959) and *Electromation, Inc. v. National Labor Relations Board,* 35 F.3d 1148 (7th Cir.1994), appellants make the argument that the employee/management team mechanism in the Personnel Reform Act conflicts with the bargaining units in the Executive Order because employee/management teams are "controlled" by the employer. This argument lends no support to the appellants' case, as section 8(a) of the NLRA provides that: "It shall be an unfair labor practice for an employer ... to dominate or interfere with the formation or administration of any labor organization." Thus, the NLRA specifically forbids the use of an employer-dominated committee within a collective bargaining scheme. There is no similar statutory provision in Maryland law.

We considered early in this opinion the guiding principle underlying the rule that legislative authority is necessary as a condition precedent to a public agency entering into binding arbitration or a binding collective bargaining agreement—"to insure that a governmental agency does not, without authority, abdicate, or bargain away its statutory discretion." *Montgomery County Educ. Ass'n,* 311 Md. at 313, 534 A.2d at 984–85. We also set out in some detail the Executive Order to test the appellees' premise that "a plain reading of its provisions refutes appellants' claim that the Order creates a binding collective bargaining mechanism that cannot survive absent legislative authorization." Review of the Order in light of the rule's purpose confirms the correctness of the appellees' assessment. None of the provisions of the Executive Order, not one, makes or purports to make any agreement reached through the collective bargaining process conducted by subordinate administrative officials legally binding or to divest the Governor, the General Assembly or other public officer of discretion given them by law. And, of course, the appellees are also correct when they point out, referencing the ten factors identified by the appellants as indicative of binding collective bargaining, that "none of those factors, either singularly or collectively, causes State officials to 'bind themselves to exercise ... discretionary legislative powers ... or agree to delegate such powers to binding arbitration ....' " (quoting *MCEA,* 281 Md. at 508, 380 A.2d at 1039).

The fifth "Whereas" clause expresses the Executive Order's intent that the ability of agency heads to reach shared understandings with employees be maximized; however, it contains the proviso, "within the confines of existing law." Similarly the mediation unit is given powers to implement the Order, but, again it is conditioned on its exercise being permitted by law. ¶ D. The appellants focus on paragraph E(1) as evidencing that the Order is binding, noting, in particular, that the paragraph contemplates, indeed as does the Order as a whole, that, at the culmination of the good faith negotiations following the certification process, a memorandum of understanding incorporating the parties' agreements is to be executed. That

may be, but, as the appellees counter, there is nothing in that paragraph or in the entire Order, for that matter, that addresses how disputes concerning the memorandum are to be resolved. The Order certainly does not provide for binding arbitration or any other form of binding dispute resolution mechanism, which is the norm in binding collective bargaining agreements. *See, e.g., Anne Arundel Co.,* 313 Md. at 101, 543 A.2d at 843 ("Under § 4–107(e), '[w]henever the [County] Personnel Officer and the petitioning employee organization are in disagreement as to the determination . . ., the issue shall be submitted to arbitration at the request of either party.' According to § 4–107(e)(2), the decision of the arbitrator 'shall be final and binding on the parties.' "); *MTA,* 295 Md. at 95, 453 A.2d at 1194–95 ("Section 7–602(b) of the Transportation Article provides for arbitration of labor disputes between the MTA 'and any employees described in § 7–601' if collective bargaining fails to produce an agreement."); *MCEA,* 281 Md. at 498, 380 A.2d at 1033. This is in contrast to the manner in which disputes between competing employee organizations are to be handled: they are permitted to agree voluntarily and at their own expense to resolve election disputes using "an impartial third party arbitrator selected in accordance with such agreement, and the decision or decisions of such arbitrator shall be final and binding on such organizations." In short, the circuit court was right when it observed, "if the State fails to negotiate in 'good faith' the State employee unions have no identifiable remedy. In fact, the Executive Order lacks any provision which would require the State to submit or abide by arbitration, impasse resolution, or mediation." [15]

---

**15.** Nor should the appellants take comfort in the State Mediation Service policy, upon which it relies. That policy simply does not provide for the binding resolution of disputes, as indeed it could not since its promulgator has no such authority. *See* Md.Code ( 1957, 1991 Repl.Vol.) §§ 4–101–4–111 of the Labor & Employment Article. Contrast the powers of the Mediation Service and the policy it developed with House Bill 350, introduced in the 1996 session of the General Assembly, but failed of passage. Under that Bill, there would have been created a State Labor Relations Board, which, after reviewing a

There is another fail safe mechanism in paragraph E(1). Even if the Governor approves an agreement and signs a memorandum of understanding, to the extent that it requires legislative approval or the appropriation of funds, it still is not binding. That is precisely the reason for the provision calling for recommendations to the Legislature for approval and for the appropriation of funds where required. Furthermore, the Governor has exempted the State from negotiating on subjects that would be inconsistent with existing law.

Paragraph O(3) is yet another of the provisions that cut against the Order being characterized as a binding collective bargaining agreement. Under that paragraph, a bargaining representative is entitled to meet with and negotiate with the Governor or his designee on wages, hours, and working conditions; however, any agreement that may be reached is still "subject to the approval of the Governor." And, as the circuit court opined, "a State employee union would be afforded no legal recourse if the governor failed to approve an agreement." That is also one of the lesson of *Freeman v. Local 1802, AFSCME Council 67*, 318 Md. 684, 695, 569 A.2d 1244, 1249 (1990)("Until [the County Executive] signs an agreement, he retains the discretion to reject it, and mandamus will not lie to compel him to perform a discretionary duty"). Moreover, the Governor has retained the right to revoke the Order at any time. ¶ R. Finally, paragraph S makes clear that nothing in the Order trumps or otherwise adversely affects the Governor's constitutional and statutory rights, responsibilities, powers or duties.

Viewed in its entirety, but with particular emphasis on the Governor's completely discretionary power to either approve or refuse to approve an agreement negotiated pursuant to the terms of the Executive Order, it follows that the Governor, by promulgating the Order, has neither abdicated nor bargained away any statutory or gubernatorial authority. Rather, it is

fact-finding panel's recommendations, could "issue an order directing the parties to comply with each recommendation of the panel...."

an appropriate exercise of his constitutional and statutory oversight of the Executive Branch work force.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED, WITH COSTS TO BE PAID BY THE APPELLANTS.