856 A.2d 669

**Governor Robert EHRLICH, et al.**

v.

**MARYLAND STATE EMPLOYEES UNION,**
**American Federation of State, County**
**and Municipal Employees.**

**No. 138, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 23, 2004.

598

Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kathryn M. Rowe, Asst. Atty. Gen., Teresa M. Elguezabal, Asst. Atty. Gen., on brief), for appellants/cross-appellees.

Joel A. Smith (Jeffrey M. Ross, Kahn, Smith & Collins, P.A., Baltimore, on brief), for appellee/cross-appellant.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

On January 14, 2003—one day before the end of Governor Parris N. Glendening's term of office as Governor and four days before the Constitutional deadline for his successor, Governor Robert L. Ehrlich, Jr., to submit a balanced budget for FY 2004 to the General Assembly—a staff person in the Governor's Office, upon direction by the Governor, "approved" two memoranda of understanding (MOU) with the American Federation of State, County, and Municipal Employees (AFSCME) that carried a fiscal impact to the State of approximately $100 million. The principal issue before us in these cross-appeals is whether those MOUs are effective and enforceable. We shall hold that they are not effective and therefore are unenforceable.

BACKGROUND

A general program of collective bargaining for Maryland State employees was inaugurated in 1996, when Governor Glendening signed Executive Order 01.01.1996.13. That Executive Order recognized the right of Executive Branch employees to form or join employee organizations, bargain collective-

ly, and engage in other concerted activities and, in furtherance of those rights, provided for the creation of appropriate bargaining units and the election and certification of exclusive bargaining representatives.

The only substantive provision regarding actual collective bargaining was in the section that defined the term "collective bargaining." That provision required the "employer" and the employee exclusive bargaining organization to negotiate in good faith with respect to wages, hours, and other terms and conditions of employment. It stated further that, upon completion of negotiations, the parties "shall execute a written memorandum of understanding incorporating the terms of any agreement reached, and, to the extent they require legislative approval or the appropriation of funds, such terms shall be recommended to the Legislature for approval or the appropriation of funds, as may be necessary." The term "employer" was not defined in the Executive Order. The order stated that the exclusive bargaining representatives were entitled to meet and negotiate with the Governor or the Governor's designee in an effort to reach an agreement subject to the Governor's approval, and it enjoined "managerial and supervisory employees" from refusing to bargain collectively with the exclusive bargaining representatives. It did not, however, specify who, in particular, was to sign any MOU on behalf of the State or any State agency.

The validity of that Executive Order was challenged, largely on the basis that there was no legislative authorization for it. We sustained the order, principally on the ground that "[n]one of the provisions of the Executive Order, not one, makes or purports to make any agreement reached through the collective bargaining process conducted by subordinate administrative officials legally binding or to divest the Governor, the General Assembly or other public officer of discretion given them by law." *McCulloch v. Glendening,* 347 Md. 272, 292, 701 A.2d 99, 108–09 (1997). The order, we said, was not inconsistent with existing "meet and confer" provisions already in the State Code, *id.* at 287–89, 701 A.2d at 106–07, and was within the general authority of the Governor as the

Constitutional head of the Executive Branch of the State Government.

In an effort to provide a more solid base for a collective bargaining regime and not have it rest solely on an Executive Order that could be modified or revoked by subsequent Governors, Governor Glendening proposed legislation to the 1999 Session of the General Assembly. The bill, which was enacted as 1999 Md. Laws, ch. 298, and took effect July 1, 1999, incorporated some features and provisions of the Executive Order but was far more extensive. In a thoroughly rewritten title 3 to the State Personnel and Pensions Article (SPP), it provided collective bargaining rights for Executive Branch employees, reserved certain rights to the State, prohibited employees from engaging in strikes and the State from engaging in lockouts, set forth procedures for the election and certification of exclusive bargaining representatives and for the collective bargaining process, and created a State Labor Relations Board (SLRB) as a unit within the Department of Budget and Management (DBM) to administer and enforce the law.

The bill was extensively amended during the legislative process. The provisions particularly relevant to the instant case are (1) SPP §§ 3–501 and 3–601, dealing with the collective bargaining process and MOUs, and (2) §§ 3–206 and 3–207, authorizing the Secretary of Budget and Management, by regulation, to define unfair labor practices and authorizing SLRB to investigate and take appropriate action in response to complaints of unfair labor practices. As enacted in 1999, the law did not apply to any institution of higher education but only to the principal departments in the Executive Branch and certain other designated Executive agencies. In 2001, the Legislature extended the collective bargaining provisions to the State universities and colleges and, in doing so, drew a number of distinctions between them and the other Executive agencies, mostly in terms of who is authorized to negotiate, sign, and ratify agreements. See 2001 Md. Laws, ch. 341. As we are dealing here with MOUs involving non-collegiate agen-

cies, we shall limit our consideration to the provisions relating to them.

SPP § 3–501(a) requires the Governor to designate one or more representatives to participate in the collective bargaining process on behalf of the State agencies. Section 3–501(c) directs the parties to make every reasonable effort to conclude negotiations in a timely manner "for inclusion by the principal unit in its budget request to the Governor" and provides expressly that they "shall conclude negotiations before January 1 for any item requiring an appropriation of funds in the fiscal year that begins on the following July 1." Section 3–501(c)(2)(ii) directs the Governor to include in the budget bill submitted to the General Assembly any amounts in the budgets of the principal units "required to accommodate any additional cost resulting from the negotiations. . . ."

Both § 3–501(d)(1) and § 3–601 contain provisions dealing with the execution of MOUs, some of which appear to be duplicative. Section 3–501(d)(1) provides that an MOU that incorporates all matters of agreement reached by the parties shall be "executed" by the exclusive representative, on behalf of the employees, and, for the State, by the Governor or the Governor's designee. Section 3–601(a)(1) requires that an MOU contain all matters of agreement reached in the collective bargaining process. Section 3–601(a)(2) requires that the MOU be in writing, that it be signed by the exclusive bargaining representative involved in the collective bargaining negotiations, and by "the Governor or the Governor's designee." Section 3–601(c) requires, in addition, that the MOU be ratified; it states that "a memorandum of understanding *is not effective* until it is ratified by the Governor and a majority of the votes cast by the employees in the bargaining unit." (Emphasis added).

The first MOUs between AFSCME and the State were negotiated and signed under the 1996 Executive Order. AFSCME was certified as the exclusive bargaining representative for bargaining units A, B, C, D, F, and H, and, in 1997, entered into two-year MOUs with respect to those units

covering fiscal years 1999 and 2000. In 1999, still under the Executive Order, the State and AFSCME entered into new MOUs for fiscal years 2001 and 2002. The MOUs covering those four years are not in the record before us, and we do not know who signed them for the State. Governor Glendening believed that he may have signed the first ones, although he was not certain. Negotiations for an FY 2003 MOU began in late 2001/early 2002, but, in the absence of an agreement on wage increases, the MOU for FY 2001–2002 was extended to cover FY 2003.

According to Gerald McEntee, International President of AFSCME, he and Governor Glendening agreed to bifurcate negotiations with respect to a 2004 MOU—to deal first with non-economic issues and postpone negotiations on economic issues until after the general election in November, 2002. By July, 2002, a tentative agreement, in principle if not in language, had been reached on the non-economic issues, but no meetings took place with respect to economic issues until November 14, 2002, at which time the Governor, whose term of office would end in two months, apparently agreed to a 2% increase in wages for all State employees and certain other terms. Negotiations as to language bogged down, however, and a tentative agreement on an actual draft was not reached until December 13, 2002, when two MOUs—one for bargaining units A, B, C, D, and F, and one for unit H—were approved, but not signed, by the collective bargaining committees.

The two MOUs were submitted for employee ratification on December 18, 2002 and were declared ratified on or about January 13, 2003. On January 14, 2003, the MOUs were signed by the members of the collective bargaining committee. Signing "For the State of Maryland" were Charles M. Rhodes, Jr., chief negotiator, and Andrea M. Fulton, Executive Director of the Office of Personnel Services and Benefits, Department of Budget and Management. The MOUs had no signature line for the Governor to ratify the agreements. They did, however, contain a signature line designated "Approved By," and that was signed by Gene Lynch who, until noon the next day, served as Governor Glendening's chief of

staff. It is undisputed that neither Governor Glendening nor his successor, Governor Ehrlich, signed the MOUs or made any other public pronouncement of ratification.

The General Assembly commences its annual session on the second Wednesday of January, which, in 2003, was January 8. *See* Md. Constitution, Art. III, § 14. In the year following a Gubernatorial election, the newly elected Governor is required to submit a budget for the ensuing fiscal year within 10 days after the convening of the General Assembly. *See* Md. Constitution, Art. III, § 52(3). Governor Glendening had not submitted a budget to the 2003 General Assembly prior to leaving office and, indeed, at least as a practical matter, could not have done so. Governor Ehrlich, in the belief that the State could not afford the salary increases and other benefits provided for in the MOUs, not only never ratified the MOUs but declined to fund them in the budget that he submitted on January 17, 2003.

When negotiations between AFSCME and the Ehrlich Administration regarding the MOUs failed to produce a satisfactory agreement, AFSCME filed suit in the Circuit Court for Anne Arundel County against the Governor, the State, the Secretary of Budget and Management, and the SLRB for declaratory and mandatory injunctive relief. The union asked that the court declare (1) that the two MOUs "are in full force and effect," (2) that Governor Ehrlich breached his Constitutional and statutory obligations by failing to request appropriations to fund the increases provided for in those MOUs, (3) that DBM breached statutory duties by failing to adopt regulations defining unfair labor practices and to provide administrative support to SLRB, and (4) that SLRB breached its obligation under the Administrative Procedure Act to adopt procedural regulations to permit declaratory ruling proceedings, and to investigate and remedy alleged unfair labor practices. It asked, as well that the court direct the Governor to request the necessary appropriations and direct DBM and SLRB to adopt appropriate regulations.

After hearing argument on cross motions for summary judgment, the court, on October 17, 2003, entered a memorandum opinion and order in which it concluded, in relevant part, that:

(1) By directing Mr. Lynch to sign the MOUs, Governor Glendening effectively ratified them, and that they therefore constituted "binding contracts" between the State and AFSCME;

(2) In light of Maryland Code, § 3-205 of the State Government Article, which is part of the Gubernatorial Transition Act, Governor Ehrlich, in submitting his budget to the General Assembly, was not bound by the economic terms of the MOUs and was not required to submit an appropriation for pay raises agreed to by the Glendening Administration;

(3) The MOUs were not signed and did not become final agreements until January 14, 2003, and therefore did not comply with the requirement of SPP § 3-501(c)(2)(i) that the parties conclude negotiations before January 1 for an item requiring an appropriation of funds;

(4) The Secretary of Budget and Management had adopted procedural regulations governing petitions and proceedings for declaratory rulings; and

(5) Although the Secretary was not required to adopt regulations governing unfair labor practices, AFSCME was not barred from proceeding, in the instant litigation, to demand that they do so.

Implicit in the first two findings is that, although Governor Ehrlich was not required to fund the economic provisions of the MOUs, the non-economic terms of those agreements *were* binding on the defendants. That point was made explicit in a subsequent order denying the defendants' request for a stay. In that order, entered December 31, 2003, the court stated that it had relied on SPP §§ 3-501(d)(1)(i) and 3-601(c) "in determining that the non-economic terms of the MOUs were binding."

The defendants noted a timely appeal from the order, complaining that the court erred in finding that Governor Glendening had ratified the MOUs. Their position is that no ratification occurred and that, in the absence of ratification, the MOUs were entirely ineffective. AFSCME filed a cross-appeal, complaining about the declaration that the Secretary was not required to adopt regulations governing unfair labor practices. By not pursuing the issue, AFSCME has abandoned its argument that Governor Ehrlich was required to include in his budget appropriations sufficient to fund the economic terms of the MOUs—essentially the 2% wage increase. We granted *certiorari* on our own initiative prior to proceedings in the Court of Special Appeals.[1]

## DISCUSSION

### Effectiveness of the MOUs

The major issue at the Circuit Court level was whether Governor Ehrlich was obliged to fund the wage increases agreed to by Governor Glendening. The defendants argued that he was not so obliged for three reasons: (1) the MOUs were never ratified by Governor Glendening and therefore never became effective at all; (2) they were not, in any event, signed by January 1, 2003, which was a prerequisite with respect to any term requiring an appropriation; and (3) even if the MOUs *were* properly signed and ratified, in light of provisions in Article III, § 52 of the Maryland Constitution and § 3–205 of the State Government Article, Governor Ehrlich was entitled to present his own budget to the General Assembly and was not bound to include appropriations to fund agreements made by Governor Glendening. Although the court found that Governor Glendening *had* ratified the MOUs, it agreed with the second and third points made by the defendants and for those reasons denied relief with respect to the economic issues.

---

1. It appears that, prior to our grant of *certiorari*, the Court of Special Appeals did enter an order staying the Circuit Court order, although the intermediate appellate court order is not in the record before us.

The significance of ratification extends beyond the pay raise or other economic issues, for the effectiveness and enforceability of the non-economic terms—those not requiring specific appropriations—depends on whether Governor Glendening ratified the MOUs. Apart from the question regarding the duty of the Secretary of Budget and Management to adopt regulations regarding unfair labor practices, that is the only live issue in the appeal.

The Circuit Court seemed to believe that the Governor could effectively ratify the MOUs by directing a designee, in this case his chief of staff, Mr. Lynch, to do so in his stead. That does not suffice. Both SPP § 3–501(d) and SPP § 3–601(a)(2)(i) permit the Governor's designee to sign or execute an MOU on behalf of non-collegiate State agencies. Section 3–601(c) makes quite clear, however, that an MOU on behalf of a non-collegiate agency, even though signed by the Governor's designee at the Governor's direction, "is not effective until it is ratified by the Governor." It does not permit *ratification* by a designee of the Governor, but only by the Governor him/herself.

Section 3–601(c) was a new provision. There was no counterpart to it in the Executive Order. Because, as we made clear in *McCulloch, supra,* 347 Md. 272, 701 A.2d 99, the Executive Order did not bind the Governor to do anything and did not serve to limit any discretion on his part, whether he ratified an MOU was of no consequence. If he or, at his direction, some designee signed an MOU that required appropriations or statutory changes to implement and the Governor later decided not to request such appropriations or changes, he could not be compelled to do so.

The statute, at least on its face, *does* purport to limit the Governor's discretion. Section 3–501(c)(2)(ii) requires that "[i]n the budget bill submitted to the General Assembly, the Governor shall include any amounts in the budgets of the principal units required to accommodate any additional cost resulting from the negotiations...." Given that statutory mandate which, coupled with the Constitutional mandate of

Art. III, § 52(4)(g) of the Maryland Constitution, would seem to require at least the incumbent Governor during whose term of office the MOU was signed to include appropriations to fund the MOU provisions, the Legislature obviously wanted to make certain that the Governor personally understood and approved what was in any MOU signed at his direction. It may well be that, if the Governor personally signs an MOU rather than having it signed by some designee, his act of personally signing it will suffice as a ratification, but that is not what occurred here and we need not rule on that point in this case. Clearly, when the Governor does not sign the MOU, a separate ratification by the Governor is required.

The question arises, then, of what is required for ratification. The term is neither defined nor described in the statute, but, because the term can be construed in a number of ways, depending on the context of its use, we need to focus on what the Legislature likely intended.

Black's Law Dictionary gives two definitions of the term, one generic and one with particular reference to contracts:

"1. Confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done <the board of directors' ratification of the president's resolution>. 2. *Contracts.* A person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent <an adult's ratification of a contract signed during childhood is necessary to make the contract enforceable>."

BLACK'S LAW DICTIONARY 1268–69 (7th ed.1999).

The Restatement Second of Agency is generally in accord. It defines ratification as "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." RESTATEMENT (SECOND) OF AGENCY § 82 (1958). Although in some instances, ratification may be done expressly or by implication and may be achieved orally, in writing, or even by

mere acquiescence, in other instances more formality is required. In *Sprecher v. Sprecher,* 206 Md. 108, 114–15, 110 A.2d 509, 512 (1955), where the question was whether the grantor who had executed a deed while she was a minor had sufficiently ratified the deed upon reaching majority, we observed that "[a]ll of the authorities seem to recognize that there must be some positive act or declaration of an unequivocal nature in order to establish ratification." Neither general statements nor acquiescence sufficed.

■ The context here, we think, requires some clear, affirmative, public act by the Governor. MOUs that embody collective bargaining agreements can affect the salaries or fringe benefits of 80,000 or more State employees. They can have enormous fiscal implications for the State and will likely be a significant factor in the Legislature's budget deliberations and, through those deliberations, in the establishment of public policy priorities. By requiring gubernatorial ratification, not required in the precursor Executive Order, the General Assembly no doubt wanted to make certain that the Governor not only fully understood the terms and conditions of the agreement but expressed his/her approval in an unmistakable and public manner—a manner that could be documented in a way as to be beyond dispute. If, for whatever reason, the Governor chooses not to document his/her ratification in the most normal way, by signing the MOU, there must be some public act or statement of an equivalent nature.

■ Nothing of that kind occurred here. Governor Glendening neither signed the MOUs nor made any public pronouncement, following their execution by his designees, that he had read them and affirmatively ratified them. In deposition testimony, he said that Mr. Lynch had "summarized" the MOUs for him:

"He did get back and said, We have an agreement. I said, Great, and I said, What are the main issues, and I recall specifically he went through them and said that they were all consistent, and I don't recall the details right now, but

that's what he said, and that's when I said, Great, go ahead and wrap it up, which means do the final drafts and sign it."

The Governor testified further that, in January, Mr. Lynch advised that "it was done, and it ended the process as far as I was concerned, and he signed the contracts by authority as was to be the case." Although the record demonstrates that Governor Glendening personally discussed some of the main issues with AFSCME officials, gave general direction to his designees regarding those issues, and was kept apprised from time to time of the status of the negotiations, there is simply nothing in the record to indicate that he ever actually read the MOUs once they were completed and signed or that he took any clear, positive step to ratify them. Accordingly, under the clear terms of SPP § 3–601(c), those MOUs never became effective.

### *Adoption of Regulations*

■ The administrative aspects of the collective bargaining law for the non-collegiate agencies are dealt with in SPP §§ 3–201 to 3–210. As noted, the law created the SLRB as a unit within DBM. SPP § 3–205 requires the Department to "provide administrative support" to SLRB. Section § 3–206 makes SLRB responsible for administering and enforcing the provisions of title 3 and authorizes it to establish guidelines for creating new bargaining units, establish standards for determining an appropriate bargaining unit, investigate and resolve disputes about appropriate bargaining units, establish procedures for and resolve disputes concerning elections for exclusive representatives, and "investigate and take appropriate action in response to complaints of unfair labor practices and lockouts." § 3–206(b). Section 3–207 authorizes the Secretary of Budget and Management to "adopt and enforce regulations, guidelines, and policies to carry out this title which: (1) define unfair labor practices; and (2) establish permissible labor-related activities on the work site."

SPP § 3–207 does not, on its face, *require* the Secretary to adopt regulations, but states only that the Secretary "may" do so. That is true as well for the authority conferred on SLRB

by SPP § 3–206(b); it provides that the SLRB "may" do those things.

There are certain provisions in the State Administrative Procedure Act (State Government Article (SG), title 10, subtitles 1 and 3) that permit interested persons to prod agencies to adopt and interpret regulations. SG § 10–123 permits an interested person to submit to an agency a petition for the adoption of a regulation and requires the agency, within 60 days after the petition is submitted, to either, in writing, deny the petition and state the reasons for the denial, or initiate the procedures for adoption of the regulation. Section 10–123 is part of Part IV of subtitle 1 of title 10, which contains certain special provisions dealing with regulations. Section 10–122 of that Article requires each agency subject to the statute to adopt regulations "to govern procedures under this Part IV of this subtitle, including the related forms that the unit requires and the instructions for completing the forms." Finally, SG § 10–304 allows an interested person to submit to an agency a petition for declaratory ruling as to how the agency would apply a regulation of the agency or a statute that the agency enforces to a person or property on the facts set forth in the petition. Section 10–304(b) requires the agencies to adopt regulations that set forth the form for a petition and the procedures for submission, consideration, and disposition of a petition.

On April 18, 2002, the Executive Director of AFSCME wrote to the Secretary of Budget and Management, noting, among other things, that AFSCME was "interested in the timetable for the promulgation of regulations for the State Labor Relations Board operations and for Unfair Labor Practices which are under the jurisdiction of your office" and indicating concern "about what procedure is in place prior to the implementation of these regulations." It does not appear that the Secretary ever answered that letter. Aside from that letter and one or more requests for information under the Public Information Act, there is nothing in the record to indicate that AFSCME ever filed or attempted to file with either the Department or SLRB a petition under SG § 10–123

for the adoption of a regulation or under SG § 10–304 for the interpretation of a statute or regulation.

In its complaint, AFSCME alleged that SLRB had "not carried out" any of the tasks assigned by SPP § 3–206(b) and that the Department had failed both to provide administrative support to SLRB as required by § 3–205 or to adopt regulations under § 3–207. Those failures on the part of the Department, AFSCME complained, had prevented SLRB from carrying out its responsibilities. It asked that the court declare those failures to be contrary to law and to decree that "the Secretary of Budget and Management and the State Labor Relations Board shall execute and perform their statutory obligations to draft, publish for public comment and promulgate regulations consistent with Md.Code Ann., State Gov't § 10–304(b); and Md.Code Ann., State Gov't § 3–207."

In response to those allegations, the Circuit Court noted, first, that the law did not require the Department to adopt regulations under § 3–207 but merely authorized it to do so. The court also pointed out that, in conformance with the requirement of SG § 10–304, the Department had, in fact, adopted regulations governing petitions for the adoption of regulations. *See* COMAR 17.02.02.01 and 17.02.02.02. The court also concluded, however, that AFSCME's April, 2002 letter to the Secretary inquiring about a timetable for regulations sufficed as a petition under SG § 10–123 for the adoption of regulations and that "[s]ince regulations were not adopted even though discretionary, it is not appropriate to bar AFSCME from proceeding in this litigation."

AFSCME complains that the court's literal reading of § 3–207 as merely authorizing the adoption of regulations is too superficial. Absent regulations defining unfair labor practices, the union says, SLRB cannot effectively perform its statutory functions. AFSCME asks that we either construe the statute as mandatory or hold that the Secretary abused his/her discretion in refusing to adopt regulations. We find no merit in that argument. For one thing, the Legislature carefully cast the Secretary's adoption of regulations in this

regard as discretionary, not mandatory. As we pointed out, in other statutes, the Legislature has directed agencies to adopt certain kinds of regulations by using the word "shall." It knows how to fashion a true legislative mandate. Here, with full knowledge of its intended scheme of splitting responsibility between the Department and the SLRB, it used the word "may." If the refusal of the Secretary to exercise his/her authority makes the implementation of the law more difficult, the Legislature is free to make the authority a duty or deal with the issue by statutorily defining unfair labor practices.

■ We take issue as well with the Circuit Court's construction of AFSCME's April, 2002 letter as a petition under SG § 10–123. As the court noted, the Department had in place regulations governing the filing of petitions for both the adoption of regulations and for declaratory rulings. *See* CO-MAR 17.02.02.01 and 17.02.02.02. Those regulations set forth who may file a petition, the form of a petition, and the manner of submission. A petition for the adoption of a regulation must contain, among other things, "a brief statement of the regulation or amendment the petitioner proposes...." CO-MAR 17.02.02.01.B. AFSCME's April, 2002 letter did not come close to complying with that requirement. It simply expressed interest in the "timetable for the promulgation of regulations" and inquired as to the procedure to be followed prior to the adoption of regulations. On this record, we fail to see what relief a court could properly order.

JUDGMENT OF CIRCUIT COURT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS TO DISMISS COMPLAINT; COSTS TO BE PAID BY APPELLEE/CROSS–APPEL-LANT.