21 A.3d 1098

MARYLAND TRANSPORTATION AUTHORITY

v.

MARYLAND TRANSPORTATION AUTHORITY POLICE LODGE # 34 OF THE FRATERNAL ORDER OF POLICE.

No. 131, Sept. Term, 2010.

Court of Appeals of Maryland.

June 20, 2011.

142

Kathleen E. Wherthey, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

Michael Marshall (Herbert R. Weiner of Schlachman, Belsky & Weiner, P.C., Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

In 2006, the Maryland Transportation Authority Police Lodge # 34 of the Fraternal Order of Police, Inc. ("FOP") convinced a receptive member each of the Maryland House of Delegates and of the Senate to introduce legislation in their respective chambers authorizing collective bargaining for the FOP's members. Subsequently, the FOP and the Maryland Transportation Authority ("MdTA") discussed the pending

legislation.  In an effort to avoid a legislative showdown over the proposed legislation, the parties struck à written memorandum agreement ("the Agreement") in which the MdTA agreed to fund a three-year, $11.46 million "personal patrol vehicle program" ("the take-home vehicle program" or "THV program"), "[p]rovided the bills [were] withdrawn, and no collective bargaining legislation covering the MdTA[ was] passed this session. . . ." In addition, the FOP agreed not to advocate for such legislation in the following two legislative sessions.  This multi-million dollar agreement was spread over a single page.

In the maiden year of the THV program, then-Governor Robert Ehrlich's administration funded the program.  The incoming administration of Governor Martin O'Malley, however, declined to continue the funding.  The FOP sued on theories of breach of contract and promissory estoppel, claiming in a sense that "the King has [simply and illegally] changed his mind."  It is our view that, under well-settled principles of State collective bargaining law, the agreement between the FOP and the MdTA is unenforceable.

## I.  Factual and Procedural Background

The February 2006 Agreement[1] was signed by the President of the FOP, Corporal John Zagraiek, and the then-Executive Secretary of the MdTA, Trent Kittleman.  At first glance, the Agreement appears somewhat aspirational, demanding that the FOP "ask the sponsors to withdraw the[ir] collective bargaining bills."  A thorough reading, however, reveals that the Agreement was results-oriented, requiring as a condition that "the bills [be] withdrawn [actually], and [that] no collective bargaining legislation covering the MdTA[be] passed this session. . . ."[2] In exchange, the MdTA would fund the THV program as follows:

---

1. The Agreement is reproduced as an Appendix to this opinion.

2. It was not until the 2010 legislative session that the General Assembly enacted legislation authorizing the MdTA to bargain collectively with its employees.  *See* Chapter 704 of the Acts of 2010.

- The [MdTA] will add funds to the FY '07 budget for the first phase of the proposed [THV] program, in [an] amount reasonably close to the $3.82 million outlined in the current proposal.

- In each of the next two fiscal years, the [MdTA] will continue to fund the three-year phase-in of the [THV] program, provided that no collective bargaining legislation covering the MdTA[ ] is passed.

Without more, the Agreement concludes that the take-home vehicle program "will be essentially the program outlined in the [N]otebook prepared by the MdTA[ ], in conformance with all laws and regulations." The referenced Notebook was approximately 400 pages in length.

According to the FOP's complaint, "[o]n 20 April 2006, the [MdTA] Board held a meeting where the members unanimously approved the plan to implement, over a three[-]year period, a police vehicle take[-]home program for sworn [MdTA] police personnel in exchange for withdrawal of [the] bills. . . ." The governing body of the MdTA "consists of" the Secretary of the Transportation Department as *ex officio* chairman and eight other members appointed by the Governor. Maryland Code (2001, 2008 Repl.Vol., 2009 Supp.), Transportation Article ("Transp."), § 4–202(a)–(b). For its part under the Agreement, the FOP entreated successfully Delegate Steven DeBoy, Jr. and Senator John Gianetti, Jr., the bills' respective sponsors, to withdraw their collective bargaining bills. According to the FOP, thereafter, the MdTA "undertook steps to implement the [THV] program," "includ[ing] ordering an initial 25 cars, which the MdTA successfully purchased and delivered, and marketing the [THV] program to prospective recruits as an incentive for joining the MdTA force." The FOP noted several benefits from the adoption of the THV program, including that it would lead to an increased police street-presence. The briefs filed with this Court, the content of oral argument, and a review of the Notebook, however, make clear that the primary value of the THV program was as a non-monetary benefit for new *and* current officers.

In 2006, Governor O'Malley was victorious in the gubernatorial election. A few months after his administration assumed control of the Executive Branch, a newly-configured MdTA Board voted to discontinue the MdTA take-home vehicle program. On 29 June 2007, a day after that vote, the FOP filed a complaint in the Circuit Court for Baltimore County for breach of contract and promissory estoppel.[3] Over the course of the proceedings in the trial court, the FOP amended its complaint twice, without material change impacting the issues before us now.

The MdTA filed a motion to dismiss, asserting that (1) the Agreement was unenforceable as too indefinite and (2) against public policy.[4] Under the "public policy" contention, the MdTA posited that the Agreement is void as violative of (a) legislative ethics, (b) delegated powers and sovereign immunity, (c) procurement laws, and (d) collective bargaining laws. Moreover, the MdTA averred that promissory estoppel may not be maintained against a State agency, and, alternatively, the FOP neither satisfied the elements of promissory estoppel nor overcame the same barriers (i.e., indefiniteness and public

---

3. Besides the FOP, eleven individual police officers joined the complaint as plaintiffs. They included Antwan Boykin, Yancy Anthony, Kevin Hoak, Daniel Smith, Carl Pelton, Tom Shepke, Joseph Dugan, James Schuler, Stephen Kolackovsky, Ernest Wright, and Edgar Caraballo. Some of these plaintiffs alleged that, but for the take-home vehicle program, they would have "retired substantially earlier, or ... accepted employment with other police agencies offering take-home cars or other 'competitive benefits'...." *Md. Transp. Auth. Police Lodge # 34 of FOP, Inc. v. Md. Transp. Auth.*, 195 Md.App. 124, 147, 5 A.3d 1174, 1187 (2010). Several officers complained also that, but for the THV program, they would not have accepted assignments at a remote bridge station. *Id.* We shall refer collectively to the plaintiffs/Respondents as "the FOP."

4. The FOP named as defendants the State of Maryland, the MdTA, the MdTA Board (which is not a legal entity independent of the MdTA), the MdTA Executive Secretary, the MdTA Chairman, and nine individual current and former MdTA members. This latter group included Susan Affleck Bauer, Louise Hoblitzell, Carolyn Peoples, Carol Rieg, Walter Woodford, the Rev. Dr. William Calhoun, Sr., Isaac Marks, and Michael Whitson; the former MdTA member was John Norris, Jr. We shall refer collectively to the defendants/Petitioners as "the MdTA."

policy) that rendered the Agreement unenforceable otherwise. The FOP responded that the Agreement was clear and definite and that it did not run counter to public policy. The FOP attempted also to distinguish cases the MdTA cited for the proposition that an action for promissory estoppel may not lie against a State agency or unit. According to the FOP, reliance, in this case, was not only reasonable, but also carried consequences.

The Circuit Court agreed ultimately with the MdTA. In granting the MdTA's motion to dismiss, the Circuit Court stated that:

It is up to [Executive] Secretary Kittleman to make sure that what she's doing on behalf of the Maryland Department of Transportation is lawful and legal. And in this case, it's not even close. . . .

It appears to be some sort of executive hubris that ["]I'm the Secretary—I can do whatever I want to do. I'm not subject to the laws of the State like everyone else in the State government. . . ."

[I]t appears to me [that the Agreement is] completely unenforceable on the ground of sovereign immunity. It seems to me it violates the procurement laws, and the collective bargaining laws that are well established in our State.

\*　　\*　　\*

I have to lay all the blame for you all being here today on [Executive] Secretary Kittleman and the [MdTA] Board for just doing something that involves millions of dollars without, it appears to me, ever contacting a lawyer in the Attorney General's Office to say "can we do this."

Despite verbalizing various grounds for its ruling in favor of the MdTA, the Circuit Court issued a written order, citing more generally as grounds for its action "the reasons stated in the [MdTA's] motion and the memoranda submitted in sup-

port thereof." [5]   The FOP appealed timely to the Court of Special Appeals.

## II.   The Court of Special Appeals's Decision

In a 102–page reported opinion, a panel of the Court of Special Appeals concluded ultimately that the Circuit Court erred. *Md. Transp. Auth. Police Lodge # 34 of FOP, Inc. v. Md. Transp. Auth.*, 195 Md.App. 124, 5 A.3d 1174 (2010). The intermediate appellate court began its opinion with a review of the formation, statutory authorization, and operations of the MdTA. *Md. Transp. Auth.*, 195 Md.App. at 134, 5 A.3d at 1179. This prefatory foray was understandable—the Court of Special Appeals grounded significant portions of its later analysis on the notion that the MdTA has been ceded by the General Assembly a unique degree of independence and power, perhaps unprecedented among State agencies. Then, the panel of the intermediate appellate court examined each of the MdTA's arguments against the enforceability of the Agreement and the sustainability of a promissory estoppel claim. Although we shall reverse the Court of Special Appeals's judgment solely on the ground of the collective bargaining laws (as explained *infra),* we shall summarize, for contextual purposes, the intermediate appellate court's expansive treatment of the parties' arguments and counter-arguments.

### A.   *Indefiniteness*

As it did before the Court of Special Appeals, the MdTA argues that " 'no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms.' " Brief of Petitioner at 16 (quoting *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354, 356 (1950)). "[T]he one page memo," which "contains no fixed

---

5.   In opposing the MdTA's motion to dismiss, the FOP submitted various exhibits, which the Circuit Court considered. As such, the MdTA's motion to dismiss was treated as a motion for summary judgment. *See* Maryland Rule 2–322(c) ("If, on a motion to dismiss . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . .").

type, quantity, or price terms concerning a multi-year take-home car program," the MdTA continues, "[is] not clear and definite enough to constitute an enforceable contract."

The FOP maintains that the parties incorporated by reference the 400–page Notebook, which provides all of the necessary essential terms, including:

[R]esearch on [THV] programs and their implementation, the cost of losing police officers each year, research on the need for retention of police officers, a breakdown of the cost to fund the program, research on the need of the MdTA to have its police officers respond more quickly and efficiently in certain events, and more.

Quoting the principle that " 'courts are reluctant to reject an agreement, regularly and fairly made,' " the intermediate appellate court held the one-page "Memorandum," standing alone, "sufficiently expresses, with definiteness and certainty, the nature and extent of the parties' obligations." *Md. Transp. Auth.*, 195 Md.App. at 160, 161, 5 A.3d at 1195 (quoting *Quillen v. Kelley*, 216 Md. 396, 407, 140 A.2d 517, 523 (1958)). "Even if the Agreement ... contained insufficient detail to be enforceable," the court explained in reasoning in the alternative, "the Agreement's reference to the '[N]otebook,' and its explicit indication that 'the [THV] program will be essentially the program outlined in the notebook,' make clear that the '[N]otebook' was incorporated by reference into the Agreement, and provided the details of the program that the MdTA was agreeing to implement." *Md. Transp. Auth.*, 195 Md.App. at 162, 5 A.3d at 1196.

## B. *Public Policy*

### 1. *Legislative Ethics*

The MdTA contends that the Agreement constituted a "contract[ ] under which one party [would] obtain[ ] compensation for using personal influence over legislators, or legislation, to benefit another," in violation of Maryland law. Stated another way, the MdTA posits that the Agreement is improper because it (1) calls for "the use of personal influence rather

than persuasive facts and arguments," *see Wildey v. Collier*, 7 Md. 273, 279 (1854), and (2) is dependent upon the defeat of legislation. *See* Md.Code (1984, 2009 Repl.Vol., 2010 Supp.), State Government Article ("S.G."), § 15–713(1)(i) ("A regulated lobbyist may not ... be engaged for lobbying purposes for compensation that is dependent in any manner on ... the enactment or defeat of legislation....").

The FOP retorts that "the Agreement only required that ... FOP members present the legislators with factual information explaining their preference for the [take-home vehicle p]rogram over collective bargaining." Moreover, the FOP disputes the characterization of the Agreement as contingent on the defeat of legislation. The FOP argues that "[t]he Agreement states [only] that the FOP will '*ask* sponsors to withdraw the collective bargaining bills.'" (Emphasis added.) It does not require that "the FOP 'defeat[ ]' the bills ... or ... that the two bills not be passed."

After a survey of relevant Maryland law and treatises, the Court of Special Appeals determined that "whether ... contracts contemplate[ ] improper influence upon State officials" is "a question of fact...." *Md. Transp. Auth.*, 195 Md.App. at 170, 5 A.3d at 1200; *see id.* (stating that the Court of Appeals in *Frenkil v. Hagan*, 146 Md. 94, 105, 125 A. 909, 913 (1924), "remanded for an evidentiary determination of whether the contracting parties expected to advocate to exert improper 'political influence'"). In the present case, the intermediate appellate panel concluded that the FOP's "uncontroverted affidavits ... describ[ed] advocacy that, on its face, was aboveboard." *Md. Transp. Auth.*, 195 Md.App. at 171, 5 A.3d at 1201.

With respect to the contingent-agreement argument, the Court of Special Appeals held that the Agreement did not represent a prohibited arrangement under S.G., § 15–713(1)(i). *Md. Transp. Auth.*, 195 Md.App. at 172, 5 A.3d at 1202. The panel stressed that Maryland caselaw is concerned with "contingent *financial* incentive[s]," and the present Agreement involves only "public policy compromises...." *Id.* "To de-

scribe the trade-offs struck in the course of lawmaking as 'compensation' on a 'contingency basis,'" the Court of Special Appeals concluded, "is to stretch the meaning of those terms beyond their breaking point." *Md. Transp. Auth.*, 195 Md. App. at 172–73, 5 A.3d at 1202. Thus, as neither "the [FOP nor] its members [were] . . . disinterested parties *hired* to represent others' interest without any personal stake in the outcome," the statute governing lobbyists is inapplicable. *Md. Transp. Auth.*, 195 Md.App. at 172, 5 A.3d at 1202 (emphasis added) (internal quotation marks omitted). *But see S.G.*, § 15–701(a)(1)(ii) (defining "regulated lobbyist" as an entity that, "for the purpose of influencing any legislative action . . . [,] communicates with an official or employee of the Legislative Branch . . . and . . . earns at least $5,000 compensation for all such communication and activities"); Brief of Respondent at 17, 19 (describing the multimillion dollar THV program, which required the FOP's promise to communicate with two legislators, as "a *benefit* for all MdTA police officers").

### 2. *Delegated Powers and Sovereign Immunity*

The MdTA alleges further that, in forming the Agreement, the "Secretary of the Authority . . . exceeded . . . legislatively granted powers, and[,] therefore[,] the . . . resulting contract is [ (1) ] unenforceable as *ultra vires* and [ (2) ] barred by sovereign immunity." Although the Legislature invested in the MdTA "extraordinary power to set and collect public tolls," the MdTA posits, "the General Assembly expressed no intent to permit [the MdTA] to . . . use those same funds to influence . . . lawmaking. . . ." The MdTA continues that "[t]here is every reason to infer that the [L]egislature had no such intent," as "[t]he risk of conflict and abuse is self-evident when, as here, a public entity seeks (directly or indirectly) to lobby the very elected [L]egislature responsible for establishing its existence and powers." Consequently, in entering the Agreement, the MdTA exceeded its power, i.e., acted outside the scope of its authority, thereby rendering the contract ultra vires, as well as barred by sovereign immunity. *See S.G.*, § 12–201(a) ("[T]he State, its officers, and its units may not

raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or [one] of its units while the official or employee was acting *within the scope of* [*his/her*] *authority* . . . ." (emphasis added)).

In riposte, the FOP asserts that the MdTA possesses a unique and vast amount of autonomy with respect to use of its funds. As such, the MdTA enjoyed necessarily the authority to enter into this contract. Moreover, in drafting this agreement, the MdTA was not hiring private lobbyists, but rather promoting the "recruit[ment] and retain[ment of] qualified police officers," a "strong" and presumably proper "interest to the MdTA. . . ." As further indication that the MdTA was not hiring private lobbyists, the FOP reiterates that "no money [was] paid to the FOP or its members; rather the benefit was to the MdTA Police Force as a whole."

The Court of Special Appeals agreed with the FOP that the THV program "was not an elaborate means of compensating the [FOP] for advocating the *agency's* position to the Legislature." *Md Transp. Auth.,* 195 Md.App. at 184–85, 5 A.3d at 1209 (footnote omitted). Therefore, the intermediate appellate court concluded "the Agreement . . . is [not] an *ultra vires* hiring of lobbyists, beyond the scope of the agency's enumerated powers." *Md. Transp. Auth.,* 195 Md.App. at 185, 5 A.3d at 1209. In emphasizing the word "agency's," the intermediate appellate panel seemed to suggest that the FOP was advocating its own position by seeking withdrawal of the collective bargaining bills. *But see* Brief of Respondents at 5 ("For approximately three years, the FOP had been seeking collective bargaining by attempting to introduce legislation providing for collective bargaining.").

With respect to the doctrine of sovereign immunity, the Court of Special Appeals determined that "the State has waived [such] . . . immunity under limited circumstances in regard to claims based on written contracts," as in the present case. *Md. Transp. Auth.,* 195 Md.App. at 156, 5 A.3d at 1193 (citing *Magnetti v. Univ. of Md.,* 402 Md. 548, 560–62, 562 n. 6

937 A.2d 219, 226, 227 n. 6 (2007)). Having decided that the MdTA was not hiring lobbyists via the Agreement, the intermediate appellate court did not consider further the MdTA's contention that the doctrine applies nevertheless to ultra vires written contracts. *See id.*

### 3. *Procurement*

The MdTA proffers that the Agreement is a procurement contract, be it either for vehicles or lobbying services. In either case, it did not comport with relevant procurement laws, or so the MdTA avers, and is therefore unenforceable. The FOP argues (as it did before the Court of Special Appeals) that the Agreement, which involves the procurement of *only* vehicles (not services), is exempt from State procurement law. The FOP points out that "procurement *includes* 'the process of . . . obtaining services' " (supposedly like lobbying), but not "capital expenditures," which "are exempt from ordinary procurement rules." Brief of Respondent at 23 (emphasis added) (quoting Md.Code (2001, 2009 Repl.Vol., 2010 Supp.), State Finance and Procurement Article ("S.F.P."), § 11–101(m)).

The Court of Special Appeals agreed that procurement includes "the process of obtaining services," i.e., the process of obtaining "the labor, time, or effort of a contractor." *Md. Transp. Auth.*, 195 Md.App. at 175–76, 5 A.3d at 1204 (quoting S.F.P., § 11–101(m)(1), (w)(1)(ii)). The intermediate appellate court noted, however, that the FOP overlooked S.F.P., § 11–101(m), which states that procurement includes also " 'the process of . . . obtaining supplies. . . .' " *Md. Transp. Auth.*, 195 Md.App. at 175, 5 A.3d at 1204. The term "supplies" may refer to "tangible personal property," presumably including vehicles. *Md. Transp. Auth.*, 195 Md.App. at 175–76, 5 A.3d at 1204 (quoting S.F.P. 11–101(w)(1)(ii)). The intermediate appellate court explained also that the statute excepts the MdTA in some, but not all, respects. *Md. Transp. Auth.*, 195 Md.App. at 177, 5 A.3d at 1204 (quoting S.F.P. § 12–101(a), which states that "[t]his section does not apply to capital expenditures by the . . . [MdTA], in connection with State

roads, bridges, or highways. . . .''). As a result, it concluded that, unless exempted expressly, the Legislature intended for the procurement laws to apply to the MdTA. *Id.*

Nevertheless, our intermediate appellate brethren concluded that this particular agreement was not a procurement contract, making inapposite (1) State procurement laws, as well as (2) administrative law principles, which otherwise would require that the dispute be heard first by the relevant agency, the Board of Contract Appeals, before recourse to the courts. *Md. Transp. Auth.*, 195 Md.App. at 181, 5 A.3d at 1207. The Court of Special Appeals granted that "the Board of Contract Appeals is not 'palpably without jurisdiction' over a 'contract for the procurement of . . . services to be rendered to the State,' even if that contract may not technically be a 'procurement contract.' " *Md. Transp. Auth.*, 195 Md.App. at 182–83, 5 A.3d at 1208 (quoting *State v. Md. State Bd. of Contract Appeals and Law Offices of Peter G. Angelos, P.C.*, 364 Md. 446, 458, 773 A.2d 504, 511 (2001)). It determined, however, that "[t]he Agreement is not a procurement contract for vehicles . . . because it is not an agreement between the MdTA and the supplier of the vehicles to the agency." *Md. Transp. Auth.*, 195 Md.App. at 184, 5 A.3d at 1208. Nor is the Agreement a procurement contract for lobbying services, the intermediate appellate court resolved, as "the [FOP was not] advocating for the *agency's* position to the Legislature." *Md. Transp. Auth.*, 195 Md.App. at 184–85, 5 A.3d at 1209. To conclude, the Court of Special Appeals emphasized that "the Agreement did not create a buyer-seller relationship with a State agency." *Md. Transp. Auth.*, 195 Md.App. at 185, 5 A.3d at 1209. Therefore, "whether the Agreement was a procurement contract is not 'reasonably debatable,' " and the Board of Contract Appeals "is palpably without jurisdiction. . . ." *Md. Transp. Auth,* 195 Md.App. at 183, 185, 5 A.3d at 1208–09; *see Md. Transp. Auth.*, 195 Md.App. at 183, 5 A.3d at 1208 (stating that *"Angelos* . . . teaches . . . courts [to] defer to an agency to make its own jurisdictional determination in the first instance, if the question on which jurisdiction turns is 'reasonably debatable' ").

### 4. *Collective Bargaining*

The MdTA charges also that the purported contract was a collective bargaining agreement that was noncompliant with relevant law. The MdTA points out that Md.Code (1993, 2009 Repl.Vol., 2010 Supp.), State Personnel and Pensions ("S.P.P."), § 3–503(a) defines collective bargaining as "includ[ing] all matters relating to wages, hours, and other terms and conditions of employment," and that the FOP concedes freely that the Agreement concerned a "benefit" of employment—take-home vehicles. As the Agreement involves matters associated with collective bargaining, the MdTA posits that the parties should have complied with, but did not, Title 3 of the S.P.P., which governs the process of collective bargaining. The MdTA suggests a number of statutory "preconditions," required before any agreement involving matters of collective bargaining—that is, "wages, hours, and other terms and conditions of employment"—becomes enforceable. They include (1) the employees have the right to bargain collectively, (2) the employees elected an exclusive representative, (3) the election was certified by the State Labor Relations Board, (4) the agreement was reduced to a memorandum of understanding signed by the Governor or his/her designee, and (5) the agreement was ratified by a majority of the employees in the bargaining unit.

The FOP concedes that the Agreement did not comport with the collective bargaining statute, arguing instead that compliance was unnecessary. "[T]he Agreement is not a collective bargaining agreement," but rather "a simple contract," according to the FOP. "The MdTA is assuming that collective bargaining is the sole manner in which to contract"; however, "[n]othing in the statute or [caselaw] excludes the ability to enter into a simple contract absent the availability of collective bargaining."

The Court of Special Appeals held that "the Agreement was not subject to the [preconditions/] requirements related to collective bargaining agreements." *Md. Transp. Auth.*, 195 Md.App. at 187, 5 A.3d at 1210. The intermediate appellate

court devoted over twenty pages of its opinion to a detailed examination of nine opinions of this Court. *Md. Trans. Auth.,* 195 Md.App. at 185–208, 5 A.3d at 1209–23. It relied, however, in large part upon a few key statements in *McCulloch v. Glendening,* 347 Md. 272, 701 A.2d 99 (1997); *see Md. Transp. Auth.,* 195 Md.App. at 203–04, 5 A.3d at 1220. In *McCulloch,* we reiterated that, " 'absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees.' " *McCulloch,* 347 Md. at 275–76, 701 A.2d at 100 (quoting *Office and Prof'l Employees Int'l Union, Local 2 v. Mass Transit Admin.,* 295 Md. 88, 97, 453 A.2d 1191, 1195 (1982)). "[T]he purpose of the rule," we continued, "is 'to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion.' " *McCulloch,* 347 Md. at 276, 701 A.2d at 100 (quoting *Montgomery County Educ. Ass'n v. Bd. of Educ. of Montgomery County,* 311 Md. 303, 313, 534 A.2d 980, 984–85 (1987)). Therefore, "not all collective bargaining agreements to which the State or a governmental agency is a party require prior express legislative approval. . . ." *McCulloch,* 347 Md. at 275, 701 A.2d at 100. "[I]t is only those that contain a binding arbitration clause or are otherwise binding upon and enforceable against the State." *Id.* (citations omitted).

Without stating as much, the Court of Special Appeals seemed to reach two alternate conclusions. First, it decided that the Legislature authorized expressly the MdTA to enter into collective bargaining agreements. *See Md. Transp. Auth.,* 195 Md.App. at 204, 5 A.3d at 1220 ("[T]he Agreement [does not] violate the agency's enabling legislation by purporting to arrogate to the MdTA power that it does not have." (citation omitted)). The intermediate appellate court recognized that, in 2006, the General Assembly had not granted expressly the MdTA or its employees the right to bargain collectively. It concluded, however, that, "by virtue of its plenary authority over its own budget," the MdTA "occupies the same position as the Governor and General Assembly in

*McCulloch*" and, as such, "possesse[d] the discretionary authority to ... enter into an agreement with its employees, [like the present one]. . . ." *Md. Transp. Auth.*, 195 Md.App. at 207, 5 A.3d at 1222. In so holding, the intermediate appellate panel leaned heavily upon the following analysis:

[T]he agency is empowered to "make any contracts and agreements necessary or incidental to the exercise of its powers and performance of its duties." [Transp., § 4–205(c)(1) ]. The statutory scheme by which the MdTA exists also grants plenary authority to the agency over its own finances. It funds its operations out of the toll revenues that it collects, and those revenues "are not subject to supervision or regulation by any instrumentality, agency, or unit" of State or local government. [Transp., § 4–312(c)(1) ]. And, unlike most agencies of State government, the MdTA has the independent authority to "employ and fix the compensation of ... any ... employees that it considers necessary to exercise its powers and perform its duties." [Transp., § 4–205(d)(1) ]. Like all other expenditures of the agency, compensation of its employees comes from the agency's toll revenues. *See* [Transp., § 4–205(d)(2) ].

As we indicated, the Court of Appeals reviewed the predecessor scheme in *Wyatt v. State Roads Commission* [, 175 Md. 258, 1 A.2d 619 (1938) ] and upheld the agency's fiscal structure, determining that the agency's funds were not "moneys of the State" subject to control by the Comptroller and Treasurer. The MdTA's budget is merely "reported" to the General Assembly. *See* [Transp., §§ 4–205(d)(1), 4–210]; *see also* 70 Op. Att'y Gen. 229 (1985). Neither the Governor nor the General Assembly exercises ultimate discretion over the agency's operational expenditures or the compensation of its employees. [*But see* Transp., § 4–203(a) ("The [MdTA] is entitled to the staff provided in the State budget.").] Moreover, when the MdTA entered into the Agreement, it did not incur a debt against the treasury of the State.

*Md. Transp. Auth.*, 195 Md.App. at 204–05, 5 A.3d at 1220–21 (footnote omitted). Earlier in its opinion, the Court of Special

Appeals mentioned also that the MdTA "enjoys a 'catch-all' grant of authority, empowering it to 'do anything else necessary or convenient to carry out the powers granted' to it by statute." *Md. Transp. Auth.*, 195 Md.App. at 141, 5 A.3d at 1183–84 (quoting Trans., § 4–205(g)).

Second, the intermediate appellate court decided, seemingly in the alternative, that explicit legislative authorization was unnecessary. *See McCulloch*, 347 Md. at 275, 701 A.2d at 100 ("[N]ot all collective bargaining agreements to which the State or a governmental agency is a party require prior express legislative approval; it is only those that contain a binding arbitration clause or are otherwise binding upon and enforceable against the State." (citations omitted)). Thus, the Agreement here

> did not bargain away the MdTA's statutory discretion, or attempt to delegate to a third party the discretion of the MdTA or any other State body. Indeed, the Agreement does not delegate any decision making power to an arbitrator or any other third party.... [T]he only obligation the Agreement placed on the [MdTA] was to fund and implement the [THV] program. The Agreement was signed by the [MdTA's] Executive Secretary and was subsequently ratified unanimously by the [MdTA]. The Agreement presents no danger of any party, other than the MdTA itself, controlling the [MdTA's] purse strings.

*Md. Transp. Auth.*, 195 Md.App. at 203–04, 5 A.3d at 1220 (footnote omitted).

We granted the MdTA's petition for writ of certiorari, *Maryland Transportation Authority v. Maryland Transportation Authority Police Lodge # 34 of the Fraternal Order of Police*, 417 Md. 500, 10 A.3d 1180 (2011).

## III. Our Analysis

Whatever our reservations with regard to the Court of Special Appeals's opinion respecting legislative ethics, delegated powers/sovereign immunity, and procurement, we shall limit our analysis and holding to the intermediate appellate

court's treatment of the issue of the applicability of collective bargaining laws and principles.[6]

■ We agree that "the resolution of th[is case] ... does not turn on the label that is applied to the Agreement." *Md. Transp. Auth.*, 195 Md.App. at 203, 5 A.3d at 1220. We observe, however, that the substance of the Agreement may be said fairly to concern "collective bargaining"—considering that the statute defines "collective bargaining" as "includ[ing] all matters relating to wages, hours, and other terms and conditions of employment." S.P.P., § 3–502(a).[7] As a result—and as the Court of Special Appeals recognized—the question is whether the Legislature "authori[zed]" or "approv[ed]" the MdTA and its employees to form agreements

---

6. The trial court's disposition of the promissory estoppel claim is not before us in this appeal.

7. The FOP argues at the threshold that the Agreement was not a collective bargaining agreement, and, therefore, is not subject to Title 3 of Maryland Code (1993, 2009 Repl.Vol., 2010 Supp.), State Personnel and Pensions or relevant caselaw. Instead, the FOP posits that this was a simple contract between an agency and a group of its employees, i.e., the FOP. After all, at the time of contract formation, the FOP did not have the right to bargain collectively. At oral argument, the FOP elaborated that this was not a collective bargaining agreement because the FOP was not the exclusive representative of all MdTA police officers for collective bargaining purposes.

This position, however, amounts to saying that a group of employees in an organization may bypass the collective bargaining laws so long as the group does not possess the exclusive right to bargain collectively. In other words, the group of employees may achieve the results of a collective bargaining agreement—that is, enter into an agreement regarding wages, etc. that affects all relevant employees in an agency—while avoiding all hurdles that confront a certified collective bargaining agent. *See Md. Transp. Auth.*, 195 Md.App. at 202–03, 5 A.3d at 1220 (stating that "the Agreement ... lacks many hallmarks of collective bargaining agreement," including the fact that "the Agreement does not recognize the Lodge as the exclusive bargaining representative of the officers"). This is not, and has never been, the law.

A group of employees may argue, on behalf of all the employees of the organization, that some action should be taken; however, entering into a binding contract regarding arbitration or wages, hours, and other terms and conditions of employment is a separate matter. To enter into such an agreement, i.e., to delegate further legislatively-delegated powers, the agency must be so authorized by the Legislature.

dealing with such matters, in accordance with our longstanding rule, lately reiterated in *McCulloch*. *See McCulloch*, 347 Md. at 275–76, 701 A.2d at 100 ("[A]bsent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements . . . ." (internal quotation marks and citation omitted)). Should we find that the Legislature did not extend such an authorization, we would then confront whether this particular agreement fell within the *McCulloch* exception because "it . . . [did not] contain a binding arbitration clause or [was] otherwise binding upon and enforceable against the State." *McCulloch*, 347 Md. at 275, 701 A.2d at 100 (citations omitted).

### A. *Did the Legislature Authorize or Approve Expressly Collective Bargaining?*

█ We reviewed the many powers delegated to the MdTA throughout the Maryland Code. Undoubtedly, the General Assembly bestowed upon the MdTA not only a wide array of powers, but also a great measure of self-governance and autonomy. As such, we may conclude safely—in the same vein as the Court of Special Appeals—that the MdTA is a "special" agency, entrusted with a unique set of powers and tools to carry out those powers.

Nonetheless, we do not agree that the grant of these powers satisfies the requirement that the Legislature authorize *expressly* the formation of collective bargaining agreements. The MdTA possesses only those powers provided for in the statutes (notwithstanding a reference to "incidental" powers [8]) and only those tools necessary to execute the powers. *See* Transp., § 4–205 ("The [MdTA] may do anything else necessary or convenient to carry out the powers [*already* ] *granted* in this title." (emphasis added)). The power to bargain collectively was not among them in 2006. We explain.

---

8. *See e.g.*, Md.Code (2001, 2008 Repl.Vol., 2009 Supp.), Transportation Article ("Transp."), § 4–205(c) ("[T]he Authority may make any contract or agreement necessary or *incidental* to the exercise of its powers and performance of its duties." (emphasis added)).

In 1982, we rephrased a well-established rule: "[A]bsent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees." *Mass Transit Admin.*, 295 Md. at 97, 453 A.2d at 1195 (citations omitted). We traced the original iteration of this rule to *Maryland Classified Employees Ass'n, Inc. v. Anderson*, 281 Md. 496, 508–09, 380 A.2d 1032, 1039 (1977), which explained that:

The validity of collective bargaining agreements in which municipalities bind themselves to exercise their discretionary legislative powers over compensation of public employees in a particular manner, or agree to delegate such powers to binding arbitration, has been the subject of much recent litigation. Where municipal governments have been authorized by higher law, i.e., state constitutional provisions or public general laws or municipal charter provisions, to enter into collective bargaining agreements which bind them in the exercise of their legislative discretion, the courts have generally upheld such collective bargaining agreements, rejecting contentions that they amount to invalid abdications or delegations of legislative authority. On the other hand, in the situation where neither a public general law nor municipal charter provision authorized the municipality to bind itself in the exercise of legislative discretion over public employee compensation, the courts have generally taken the position that attempts to do so in collective bargaining agreements or municipal ordinances are invalid.

This exposition of the law, we held, was consistent with precedent dating to 1945. *Anderson*, 281 Md. at 509, 380 A.2d at 1039–40 (citing *Mugford v. City of Baltimore*, 185 Md. 266, 270, 44 A.2d 745, 746–47 (1945)), in which we stated that ("the Department of Public Works could not bind the City, by contract, in any particular relative to hours, wages or working conditions, either as to union employees, or as to all employees in the same classification. To the extent that these matters are covered by the provisions of the City Charter, creating a budgetary system and a civil service, those provisions of law

are controlling. To the extent that they are left to the discretion of any City department or agency, the City authorities cannot delegate or abdicate their continuing discretion").

In 1999, the General Assembly enacted a statutory regime to govern collective bargaining at the State level. *See* Chapter 298 of the Laws of 1999. In this statutory scheme, the Legislature granted expressly the right to bargain collectively to a limited universe of employees, while restricting expressly such right to other types of employees. MdTA employees were not among either group.

In choosing the fortunate few, the Legislature provided a caveat. S.P.P., § 3–102(b)(8) provides that "[t]his title does not apply to . . . an employee who is entitled to participate in collective bargaining under another law. . . . " Therefore, the Legislature left open the possibility that another law may authorize collective bargaining—that is, the Legislature indicated that another statutory provision may arise to grant and govern the collective bargaining process between State entities and employees.

Although the Court of Special Appeals makes no reference to this statutory exception, its opinion expresses the same idea—that other parts of the Maryland Code, pertaining to the MdTA, authorize expressly the MdTA and its employees to bargain collectively. *See* Brief of Petitioners at 36 ("The Court of Special Appeals erroneously reversed the circuit court . . . because, the opinion states, the Authority had sufficient budgetary autonomy to enter into discretionary agreements with its own employees and be bound by them, regardless of the collective bargaining statutes."). Indeed, the intermediate appellate court concluded that the MdTA enjoyed an array of delegated powers so expansive that, it stands to reason, the right to bargain collectively is included in them implicitly. The sum of these individual grants of power, our appellate brethren went so far as to suggest, imbue the MdTA with plenary power, such that the agency operates in an autonomous, parallel governmental universe. See *Md. Transp. Auth.*, 195 Md.App. at 207, 5 A.3d at 1222 ("[B]y

virtue of its plenary authority over its own budget, [the MdTA] occupies the same position as the Governor and General Assembly....").[9] As a result of this level of self-governance, the Court of Special Appeals determined that the MdTA was able to enter into a binding agreement with the FOP, irrespective seemingly of any other statutory strictures or procedures. *Md. Trans. Auth.*, 195 Md.App. at 208, 5 A.3d at 1223.

We disagree with our appellate brethren that the Legislature authorized expressly the MdTA to bargain collectively. Without debate, the General Assembly delegated to the MdTA a range of powers, including the authority to "make any contracts and agreements necessary or incidental to the exercise of its power and performance of its duties," Transp., § 4–205(c), as well as to "fix the compensation of ... any other agents and employees that it considers necessary to exercise its powers and perform its duties." Transp., § 4–205(d). The General Assembly did not authorize expressly and separately, however, the MdTA to "bargain away [that] statutory discretion." *McCulloch*, 347 Md. at 276, 701 A.2d at 100 (internal quotation marks and citation omitted).

In these particular circumstances, the Legislature may not satisfy the requirement of "express legislative authori[zation]" implicitly, i.e., through broad grants of tangentially-related powers. Indeed, when we referred to such express authorization in the past, we described specific legal provisions that not only granted the power to bargain collectively, but also set forth a detailed framework by which such bargaining is to be conducted. We were not commenting on a broad swath of legislative delegations that, when taken collectively, may authorize arguably a certain agency action. *See e.g., Anderson*, 281 Md. at 507, 380 A.2d at 1038 (discussing the implications of a Harford County ordinance which authorized "County employees ... to participate effectively in the determination

---

9. When this Court asked the FOP at oral argument whether "there's [any] ... legislative oversight of [the MdTA]," its counsel responded, "not much."

of the terms and conditions of their employment" and set forth bargaining procedures); *Mass Transit Admin.*, 295 Md. at 98, 453 A.2d at 1196 (holding that a legislative provision which permitted the Mass Transit Administration to bargain collectively with "accredited representatives of the employees who form part of any operating company," using particular procedures, did not include the union and, consequently, the two could not bargain collectively); *Montgomery County Educ. Ass'n*, 311 Md. at 305, 534 A.2d at 981 (interpreting a provision of the Education Article which "empowers a public school employer and its employees ... to meet and negotiate," in accordance with certain procedures, "a collective bargaining agreement") (internal quotation marks omitted); *Anne Arundel County v. Fraternal Order of Anne Arundel Det. Officers and Pers.*, 313 Md. 98, 543 A.2d 841 (1988) (analyzing a county ordinance which "authorizes the County to bargain collectively" pursuant to pre-set procedures); *Freeman v. Local 1802, AFSCME Council 67*, 318 Md. 684, 569 A.2d 1244 (1990) (same); *Fraternal Order of Police, Inc., Baltimore County, Lodge No. 4 v. Baltimore County*, 340 Md. 157, 665 A.2d 1029 (1995) (same).

We expect to see such an unequivocal authorization of the right to bargain collectively, as well as a promulgation of practical bargaining requirements related thereto, given that collective bargaining involves (1) delegating powers previously-entrusted to the agency, and (2) the careful balancing of important considerations, such as (a) the right of employees to take part (or not) in an employee organization, S.P.P., § 3–301(a)(1); (b) the right of employees to be fairly represented by an exclusive representative, S.P.P., § 3–301(a)(2); and (c) the right of the State to carry out its mission efficiently and effectively, S.P.P, § 3–302(1)(ii), to name a few. The initial decision to permit an agency to bargain away legislatively-given powers—as well as the decision respecting how such a relinquishment may take place—involves material policy choices that belong to a legislature, not a government agency. As such, our rule forbidding agencies from bargaining collectively preemptively—that is, from "abdicat[ing] or bar-

gain[ing] away ... statutory discretion" without express au-
thorization—remains sound.[10]

The fact that the General Assembly invested the MdTA with
powers to render the agency somewhat independent does not
alter our conclusion. No amount of statutory powers could set
adrift the MdTA in its own governmental sea where it exists
self-contained (i.e., as both governor and legislature) and
immune from most statutes and legal principles governing
virtually all other State agencies and units. The legislative
delegation of important powers does not change the fact that
in 2006 there was no "express legislative authority" to bargain
collectively.

In Title 3 of the S.P.P Article, the Legislature granted and
denied, expressly, certain groups the right to bargain collec-
tively. At the relevant time in this case, the Legislature did
not include the MdTA or its employees in either group.
Neither did the Legislature grant the MdTA, in any other
statutory provision, the authority to bargain collectively. In
these circumstances, we decline to view the broad grants of
authority as an equivalent of, or a substitute for, an express
legislative directive in this regard.[11]

---

10. As an original matter, the delegation of legislative powers invokes
the principle of separation of powers. Article 8 of the Maryland
Declaration of Rights provides that the "Legislative, Executive, and
Judicial powers of Government ought to be forever separate and dis-
tinct from each other; and no person exercising the functions of one of
said Departments shall assume or discharge the duties of any other."
We have held that there are certain powers which the Legislature may
not delegate, such as the power to enact legislation. *Benson v. State,*
389 Md. 615, 641, 887 A.2d 525, 540 (2005). Although the present case
involves the extent to which an agency may delegate further these
powers (or, in a sense, limit voluntarily its control over the exercise of
these powers), we are mindful of, but need not address, possible
constitutional implications. *See Christ v. Md. Dep't of Nat. Res.,* 335
Md. 427, 441, 644 A.2d 34, 40 (1994) ("Under our cases, delegations of
legislative power to executive branch agencies or officials ordinarily do
not violate the constitutional separation of powers requirement as long
as guidelines or safeguards, sufficient under the circumstances, are
contained in the pertinent statute or statutes.").

11. While this case was pending before the Court of Special Appeals, the
General Assembly enacted legislation authorizing collective bargaining

### B. *Does the Agreement Fall within the* McCulloch *Exception?*

As stated previously, "absent express legislative authority, a government agency cannot enter into binding arbitration or binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions for public employees." *McCulloch,* 347 Md. at 275–76, 701 A.2d at 100 (internal quotation marks and citation omitted). In interpreting this principle, we explained that "not all collective bargaining agreements to which the State or a governmental agency is a party[, however,] require prior express legislative approval; it is only those that contain a binding arbitration clause or are otherwise binding upon and enforceable against the State." *McCulloch,* 347 Md. at 275, 701 A.2d at 100 (citations omitted). "[T]he purpose of the rule . . . is to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion." *McCulloch,* · 347 Md. at 276, 701 A.2d at 100 (internal quotation marks and citation omitted). By entering into a binding contract, a government agency bargains away statutory discretion that the Legislature intended the agency alone to steward and exercise.

Because the MdTA possessed no "prior *express* legislative approval" to bargain collectively, the question, therefore, is whether such express approval was necessary to make the Agreement enforceable. In that vein, the Court of Special

---

between the MdTA and its employees. *See* Chapter 704 of the Acts of 2010. Presumably, the General Assembly would not have passed such legislation had it believed, like the Court of Special Appeals, that the MdTA possessed truly plenary power over its own affairs, including the power to bargain with the collected whole of its workforce. *See Robey v. State,* 397 Md. 449, 457, 918 A.2d 499, 504 (2007) (gleaning "further substantiation for our reading of [a statutory provision] from a revision of [that statutory provision] that occurred subsequent to the imposition of . . . restitution order [at issue]"); *Nesbit v. Gov't Employees Ins. Co.,* 382 Md. 65, 78, 854 A.2d 879, 886–87 (2004) ("Earlier and subsequent legislation can be consulted to determine legislative intent." (citation omitted)).

Appeals held that authorization was not required because the Agreement:

[D]id not bargain away the MdTA's statutory discretion, or attempt to delegate to a third party the discretion of the MdTA or any other State body. Indeed, the Agreement does not delegate any decision making power to an arbitrator or any other third party.... [T]he only obligation the Agreement placed on the [MdTA] was to fund and implement the [THV] program. The Agreement was signed by the [MdTA's] Executive Secretary and was subsequently ratified unanimously by the [MdTA]. The Agreement presents no danger of any party, other than the MdTA itself, controlling the [MdTA's] purse strings.

*Md. Transp. Auth.*, 195 Md.App. at 203–04, 5 A.3d at 1220 (footnote omitted).

Patently, the Agreement does not include a binding arbitration clause. This, however, does not end the analysis. Our precedents instruct that a government agency, without authority, may not enter into "binding arbitration *or* binding collective bargaining agreements establishing wages, hours, pension rights, or working conditions...." *McCulloch*, 347 Md. at 275–76, 701 A.2d at 100 (emphasis added) (internal quotation marks and citation omitted). That is to say, a government agency needs "prior express legislative approval" to enter into an agreement "that contain[s] a binding arbitration clause *or* [is] otherwise binding upon and enforceable against the State." *McCulloch*, 347 Md. at 275, 701 A.2d at 100 (emphasis added) (citations omitted).

In the present case, the MdTA entered into an agreement which altered and, thereby, "established" the compensation package afforded MdTA police officers. Stated another way, the MdTA formed an agreement that bound purportedly the agency and, therefore, the State.[12] By limiting its otherwise

---

12. On this score, we part ways with the Court of Special Appeals, which recognized the MdTA as a State government agency separate and distinct from the rest. We are cognizant that the MdTA enjoys broad discretion over its budget, as the revenues generated from tolls or bonds

independent discretion, the MdTA relinquished in the Agreement a large portion of the discretion entrusted by the Legislature.

Transp., § 4–205(d) states that "the [MdTA] may ... fix the compensation of any other agents and employees that it considers necessary to exercise its powers and perform its duties." The section refers only to the MdTA. Yet, the MdTA decided, in conjunction with its employees and outside

---

remain with the agency and are not transferred to the General Fund. Therefore, as the intermediate appellate court's rationale went, the MdTA entered into an agreement that was enforceable only against it, not the State.

Without addressing the constitutionality of such a funding structure, *see Wyatt v. State Roads Commission*, 175 Md. 258, 1 A.2d 619 (1938), we disagree with this position to the extent that the MdTA, despite its relative independence, remains a State agency and not a private, nongovernmental entity. Indeed, its actions are taken "on behalf" of the Maryland Department of Transportation and, therefore, the State wrote large. *See* Transp., § 4–204 ("Acting on behalf of the Department [of Transportation], the [MdTA] has those powers and duties relating to supervision[, etc.] . . . ."). Whether the General Assembly may access (without subsequent legislative revision) the funds on which the MdTA draws to support an action does not make the action itself any less "governmental." (We note also that, despite its independence, there seems to be some fluidity between the MdTA and the General Fund, as fiscal year 2012 will see "a one-time $100 million transfer to the [G]eneral [F]und ... from the [MdTA] for the InterCounty Connector." *See* DEP'T OF LEGISLATIVE SERV., FISCAL BRIEFING 31 (2011)).

In any event, the rule requiring prior legislative authorization is concerned not just with what entity incurs the immediate budgetary impact of a collective bargaining agreement. *See Md. Transp. Auth.*, 195 Md.App. at 204, 5 A.3d at 1220 (stating that this multi-year, multi-million dollar agreement, regardless of current agency inlays and outlays, "presents no danger of any party, other than the MdTA itself, controlling the ... purse strings"). *But see* DEP'T OF LEGISLATIVE SERV., ANALYSIS OF MARYLAND EXECUTIVE BUDGET 2 (2011) ("[T]he MdTA has transition[ed] from a cash-rich agency to a highly leveraged one[, a fact which] provides significant fiscal challenges both now and in the future . . . ."). The overarching concern is whether the agency is delegating authority entrusted to it by the Legislature, without prior authorization to do so. Such unapproved delegations, like those in the present case, violate the intent of the Legislature as codified in existing, controlling law. *See* Transp., § 4–205(d) ("[T]he [MdTA] may ... fix the compensation of ... any other agents and employees . . . ."). Moreover, they involve material policy choices, regarding the rights of employees and the State, that are within the province of the Legislature. *See* Transp. §§ 3–301 and 3–302.

its statutorily-regulated decision-making process, a matter the Legislature reserved for the agency's singular judgment. *Cf. McCulloch*, 347 Md. at 292, 701 A.2d at 109 (upholding an executive order authorizing a certain form of collective bargaining because "none of th[e provisions of the order], either singularly or collectively, causes State officials to bind themselves to exercise ... discretionary legislative powers") (internal quotation marks and citation omitted). Because the Legislature did not authorize expressly the MdTA and its employees to bargain collectively at the time the Agreement was executed, the Agreement is unenforceable.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

Appendix

# Memorandum

**MARYLAND SPORTATION AUTHORITY**

Robert L. Ehrlich, Jr.
Governor

Michael S. Steele
Lt. Governor

Robert L. Flanagan
Chairman

Louise P. Hoblitzell
E. Woodford Jr., P.E
John B. Norris, Jr., P.E
Hiram C. Calhoun, Sr.
W. Alfred Bauer, Esq.
Carol Ring

Trent M. Kittleman
Executive Secretary

110 Broening Highway
Suite 150
Baltimore MD 21224
410-537-1000
410-537-1095 (fax)
410-355-1024 (TTY)
1-866-713-1596

e-mail: mdta@
mdtransportation
authority.com

www.mdtransportation
authority.com

From: Trent M. Kittleman
Executive Secretary, MdTA

To: Cpl. John Zagraiek, President
F.O.P. Lodge #34

Date: February 27, 2006

Re: Personal Patrol Vehicle Program/Collective Bargaining Legislation

---

This afternoon, I met with Cpl. John Zagraiek and Lt. Kevin Anderson, along with Chief Gary McIlhinney and Dan McMullen. At this meeting, I made a proposal to fund the "Personal Patrol Vehicle Program" ("PPV") as an alternative to the Collective Bargaining Bills that are now before the House and Senate.

**Short Background**

One of the reasons the MdTA Police support collective bargaining is for recruiting purposes. Since most other police forces have collective bargaining, MdTAP considers not having collective bargaining as a potential disadvantage in the competition for the best recruits.

Another significant recruitment tool MdTAP has requested is the ability to offer each MdTA police officer a personally assigned patrol vehicle. During the recent budget process, Chief McIlhinney submitted a thoroughly documented request for a three-year phase-in of this program. We were unable to accommodate the request at that time.

**Agreement**

In essence, the proposal is that the Authority will include the PPV in the next three fiscal year budgets, and in exchange, the F.O.P. Lodge #34 will ask the sponsors to withdraw the collective bargaining bills and will agree not to support collective bargaining legislation in either of the following two years. Below are the specifics of the agreement:

> Cpl. Zagraiek, or his designee, on behalf of the F.O.P., will request Del. DeBoy to withdraw HB 1151, his collective bargaining bill, before tomorrow's hearing.

> Cpl. Zagraiek, or his designee, on behalf of the F.O.P. will ask Sen. Gianetti to withdraw SB 722, his companion collective bargaining bill.

> Provided the bills are withdrawn, and no collective bargaining legislation covering the MdTAP is passed this session, the Authority will add funds to the FY'07 budget for the first phase of the proposed PPV program, in amount reasonably close to the $3.82 million outlined in the current proposal.

> In each of the next two fiscal years, the Authority will continue to fund the three-year phase-in of the PPV, provided that no collective bargaining legislation covering the MdTAP is passed.

> The PPV program will be essentially the program outlined in the notebook prepared by the MdTAP, in conformance with all laws and regulations.

Trent M. Kittleman        Cpl. John Zagraiek